UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLOMBIA

| | | |
|---|---|---|
| Gloria Jean Ware, | ) | |
| | ) | CASE No: 1:08-cv-00233-RBW |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Nicklin Associates, Inc., *et al.* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**OPPOSITION TO MOTION
FOR SUMMARY JUDGEMENT**

Plaintiff Gloria J. Ware hereby opposes the Motion for Summary Judgment (Dkt. #5) of Stericycle, Inc. ("Stericycle"), and requests discovery relief under Rule 56(f).

Facts necessary to justify the opposition are unavailable because (1) there has been no discovery, (2) ruling on the motion should be continued to allow taking depositions and other discovery, and (3) for those reasons in this matter the Court should issue a just order. Grant of summary judgment here, without discovery, would be premature. See *Swierkewicz v. Sorema NA.*, 534 U.S. 506, 512, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002).

Accompanying this motion are exhibits, including the controverted statement of material fact (Ex. D) and the Rule 56(f) declaration of counsel (Ex. A).

In her declaration (Ex. B), Ware sets out in detail important events relating to her charges of discrimination. In the exhibits (Ex. E *et seq.*), Ware explains part of the administrative record.

1.    **Exhibits**

| Attachments  No. | Description |
|---|---|
| A | Rule 56(f) Declaration of Counsel for Plaintiff |
| B | Declaration of Gloria J. Ware |
| C | Second Declaration of Gloria J. Ware |
| D | Controverted Statement of Material Facts |

2.    **Additional Exhibits**

| Exhibit | Document Title |
|---|---|
| E | Charge of Discrimination Filed with EEOC |
| F | OHC Charge |
| G | Denial of John Nicklin to Ware's 3/9/05 Charge of Discrimination |
| H | Amendment by Gloria Ware |
| I | Supplemental Charge of Discrimination |
| J | Amendment to Charge of Discrimination |
| K | Ltr from Dana Hutter of US-EEOC DC Office of Human Rights transferring case to DC Office of Human Rights |
| L | Dismissal and Notice of Rights |
| M | Ltr. From OHC to Tarone of 11/16/07 |

3.    **Rule 56 Motion**

Under the Rule 56 motion, Stericycle argues that it was improperly named Defendant because it was not her employer, and, therefore, could not be liable for violating Plaintiff's Title VII, DCHRA or common law rights, (Def. Mem. at 1). Stericycle claims that it simply bought stock of Nicklin Associates, Inc. ("Nicklin Associates").  (*Id.* at 2).  It argues that there is no D.C. Circuit authority illuminating the theory of successor liability. It cites to *Bondy v. Humana, Inc.*, 1996 WL 294245 (D.D.C., My. 29, 1996), which denied a Rule 12(b)(6) motion seeking

dismissal. That decision, we submit, undercuts the very position Stericycle takes here. *Bondy* explains that it is unnecessary for the successor (Stericycle) to have been named before the administrative agency (EEOC and DHR) and that existence of an indemnification agreement does not let the successor of the hook. *See* id. at *4  Bondy in fact supports Ware's position.

*Bondy* undercuts Stericycle's legal footing. Stericycle fails to argue that it is not a successor. Stericycle argues it "had no involvement whatsoever with Nicklin Associates until five months after Plaintiff's discharge," (Def. Mem. at 1), citing to SMF ¶ 8, and that "Nicklin Associates is [able] to pay a judgment," although it does not proffers Rule 56 evidence in support of that conclusion.  (Def. Mem. at 4)  Declarant Matthei makes the conclusory assertion that "Stericycle had no ownership interest in or control over Nicklin Associates." (Matthei Decl. ¶ 5) It asserts the existence of a "stock purchase agreement" (Matthei Decl. ¶ 9) but fails to introduce the documents as record evidence.

Generally a "'[s]uccessor in interest' is a successor to the *wealth* of the predecessor, typically through a corporate reorganization.*"  Holland v. William Mountain Coal Co.*, 256 F.3d 819, 822 (D.C. Cir. 2001) In this circuit, successor liability is broadly applied irrespective of Title VII not explicitly addressing successor liability. (*See*, generally, *id*. at 825) Successor liability applies even to mergers. (*Id*. at 828) The D.C. Circuit approves the substantial continuity test when applying successor liability. *See Holland v. William Mountain Coal Co.*, 496 F.3d 670, 676 (D.C. Cir. 2007)

Stericycle's H.R. director (Matthei Decl. ¶¶ 1-3) claims there was no ownership interest in Nicklin prior to September 2005 Nicklin fired Ware in April 2005 and that at the time the actors Ware identifies were not Stericycle's agents. (Matthei Decl. ¶¶ 6-7)

At the time Stericycle purchased Nicklin, Ware's claims were pending before the EEOC and DHR and were under investigation. Stericycle presumably discovered Ware's claims before the purchase.  It presumably knew or should have known about Ware's claims. And presumably had Ware's claims in mind – or at least claims just like it – causing Nicklin to covenant to indemnify Stericycle from "claims that arose prior to the purchase, including Plaintiff's claims."  (Matthei Decl. ¶ 10)

Stericycle cites to the 5th Circuit's *Rejas v. TK Communications, Inc*. 87 F.3d 745, 750 (5th 1996).  In *Rojas*, however, the employer did not have notice. Stericycle, on the other hand, was apparently aware of Ware's claims or of claims just like them.

4.    **Rule 56(f) Discovery Relief**

Plaintiff incorporates by reference the Rule 56(f) Declaration of Counsel for Gloria Ware.

Because this action is at the initial pleading stage, there has been no discovery of any kind. (Counsel Decl. ¶ 1) Plaintiff will press for discovery of facts relating to successor liability and the factors applied in this circuit under the substantial continuity test, as well as under the case-by-case analytical approach that is the law in this circuit. (Counsel Decl. ¶ 2) Ware does not have the necessary information and seeks postponement of any ruling on the motion under Rule 56. (*Id.*)  Ware expects discovery will show that Stericycle exercised due diligence and business judgment in making the acquisition of Nicklin Associates stock and in fact was well aware that Ware had files charges of discrimination that were being investigated. (*Id*.) Discovery is expected to show that Stericycle negotiated purchase terms after disclosure of Ware's claims and that it was reasonably informed.  Discovery is expected to show continuation of the same business of medical waste disposal that Nicklin Associates operated and that Stericycle stands in

the shoes of the individual predecessor stockholders of Nicklin Associates. (Counsel Decl. ¶ 5)

One of the factors taken into account in this circuit is continuation of management and supervisory personnel. Such continuation exists here. Caesar Johnson, Linwood Glenn, Leslie Parker, Curtis Patton, George Fox and John Nicklin continue in supervisory or management positions. (Counsel Decl. ¶ 6) [citing to Ware 2nd Decl. ¶ 2] In fact, John Nicklin was a former owner of the company and he is apparently still involved. (Counsel Decl. ¶ 8)[citing to Ware 2nd Decl. ¶ 4] Further, discovery is expected to show that Ware's job functions and duties are being performed by others and that Stericycle uses the same type of machinery equipment and methods for the same purpose of medical waste disposal for the same hospitals of Johns Hopkins, Washington Hospital Center and Georgetown University. (Counsel Decl. ¶ 9)

Stericycle is a publicly traded company. It apparently has sophisticated acquisition policies and makes frequent acquisitions. (Counsel Decl. ¶ 10) [see Ware 2nd Decl. ¶ 5]

Many factors can be expected to go into the mix. It is a "multi-factor inquiry." *See Holland v. William Mountain Coal Co.*, 496 F.3d at 672. Among the factors identified in *Holland* are ability to pay, notice to the successor, using the same plant and equipment, and producing the same product. *Id*.

5. **Denial of Stericycle's Motion**

Stericycle fails to make the case that judgment should be entered as a matter of law. As the non-movant, Ware is entitled to the presumption that her factual assertions are true. Under the facts here, the Rule 56 motion should be denied.

WHEREFORE Plaintiff requests that the motion be denied and that the court grant Plaintiff to the right to discovery.

Respectfully submitted,


Dated: March 17, 2008                    _____/s/_____
                                         C. Michael Tarone, D.C. Bar # 159228
                                         Karl & Tarone
                                         900 17th Street, NW, Suite 1250
                                         Washington, DC 20006
                                         Tel. (202) 293-3200
                                         Fax (202)429-1851)
                                         Counsel for Plaintiff

                                         GLORIA J. WARE

<u>CERTIFICATE OF SERVICE</u>

       I, C. Michael Tarone, hereby certify that I served a copy of the foregoing on the parties identified in the Complaint who have entered appearances in this matter and those who are named as parties, by first class mail, postage prepaid or electronically, on 3/17/08 as follows:

Martin F. Cardogan, Esquire     (electronically)
c/o Andrew M. Winick, Esquire
5004 Roland Avenue
Baltimore, MD 21210

David N. Hernandez, Esquire    (electronically)
Vedder Price
875 15th Street, NW, Suite 725
Washington, DC 20005

Ms. Gloria J. Ware        (by mail)
2514 Lorring Drive
Forestville, MD 20747


           /s/ C. Michael Tarone
           C. Michael Tarone

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLOMBIA

_____

Gloria Jean Ware,                                      )
                                                                    )          CASE No: 1:08-cv-00233-RBW
            _____Plaintiff,                               )
                                                                    )
_____v.                                        )
                                                                    )
Nicklin Associates, Inc., *et al.*                    )
                                                                    )
            Defendants._____         )
_____)


**ORDER**

UPON CONSIDERATION of Defendant Stericycle, Inc.'s Motion for Summary

Judgmenet, the opposition thereto, and the Rule 56(f) Declaration of Counsel for Plaintiff, and

the record herein, it is this _____ day of April 2008 hereby

ORDERED that the motion be and hereby is denied.

SO ORDERED.


                                                                    _____
                                                                    Reggie B. Walton
                                                                    District Court Judge



Copies to:  See Next page

C. Michael Tarone, Esquire
Tarone & McLaughlin
900 17th Street, NW,
Suite 1250
Washington, DC  20006

Andrew M. Winick, Esquire
5004 Roland Avenue
Baltimore, MD 21210

David N. Hernandez, Esquire
Vedder Price
875 15th Street, NW, Suite 725
Washington, DC 20005

By US Mail
Ms. Gloria J. Ware
2514 Lorring Drive
Forestville, MD 20747

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLOMBIA

| | |
|---|---|
| Gloria Jean Ware, ) | |
| ) | CASE No: 1:08-cv-00233-RBW |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| Nicklin Associates, Inc., *et al.* ) | |
| ) | |
| Defendants. ) | |
| ) | |

## RULE 56(f) DECLARATION OF COUNSEL FOR GLORIA WARE

Counsel for Plaintiff, C. Michael Tarone, hereby asserts on 3/17/08 under penalty of perjury that the statements below that are clearly in counsel's personal knowledge are true and correct, or as otherwise stated below, which are based on information and belief.

1.     There has been no discovery of any kind in this matter, removed to district court before the time elapsed for filing an answer or responsive pleading, following service of the summons and complaint on Defendants under the rules of procedure in that court. Under the Superior Court Rules of Civil Procedure, discovery by Plaintiff in this matter was not delayed. Deposition can be taken at any time after 30 days from service of the summons and complaint. Sup. Ct. Civ. R. 30(a)(2)(C)  Interrogatories can be served at any time after commencement of the action. Sup. Ct. Civ. R. 33(a)  Document requests are similarly timed. Sup. Ct. Civ. R. 34(a)

2.     Plaintiff will seek Rule 30, 33, 34 and 36 discovery into the subject matter of successor liability under the factors of the substantial continuity test, and the case-by-case analysis, which I believe will preclude summary judgment because this action is at the initial pleading stage, discovery could not have been conducted earlier.  I have been counsel to Ware in

Exhibit A

the EEOC and OHC deliberations.  Postponement of disposition of the motion under Rule 56 is substantially justified.

3.    Discovery is expected to show that Stericycle exercised due diligence and business judgment in making acquisition and should have discovered Ware's discrimination charges formally pending before the agencies, and under investigation at the time. Discovery, however, is needed.

4.    Discovery is expected to show that Stericycle negotiated purchase terms after disclosure of Ware's claims and that it was reasonably informed. Discovery, however, is needed

5.    Discovery is expected to show continuation of the same business of medical waste disposal as Nicklin Associates and that Stericycle stands in the shoes of the individual predecessor stockholders. Discovery, however, is needed.

6.    Based on Ware's information, Nicklin Associates employees continuing to work under Stericycle include Caesar Johnson, Linwood Glenn, Leslie Parker, Curtis Patton, George Fox and John Nicklin.  Both Patton and Parker are supervisors and Johnson is shop steward and team leader. (Ware 2nd Decl. ¶ 2)

7.    Based on Ware's information, operations at Washington Hospital Center continue. (Ware 2nd Decl. ¶ 3)

8.    Based on Ware's information, John Nicklin continues to be involved in Stericycle's operations but is now based in Baltimore. Patton, Parker and Johnson were supervisors under Nicklin Associates.  (Ware 2nd Decl. ¶ 4)

9.    Discovery is expected to show that Ware's job functions and duties are being performed by others and that Stericycle uses the same type of machinery equipment and methods

for the same purpose of medical waste disposal for the same hospitals of Johns Hopkins,

Washington Hospital Center and Georgetown University.  Discovery, however, is needed

10.    Based on its 10-K, Stericycle is a publicly traded corporation having annual

revenues of almost $1billion.

11.    The 10-K states at page 3 that Stericycle demonstrates sophisticated acquisition

policies  and frequency (*see* Ware 2nd Decl. ¶ 5):

> We have substantial experience in evaluating potential
> acquisitions and determining whether a particular waste business
> can be integrated into our operations with minimal disruption.
> Once a business is acquired, we implement programs and
> procedures to improve customer service, sales, marketing, routing,
> equipment utilization, employee productivity, operating efficiency
> and overall profitability.
>
> We completed 135 acquisitions from 1993 through 2007,
> with 100 in the United States and 35 internationally.
>
> During 2007, we completed 19 acquisitions, of which ten
> were domestic medical waste businesses, one was a domestic
> assembler and distributor of containers that we use in our mail-
> back program, one was a medical waste business in Canada, six
> were medical waste businesses in Latin America, and one was a
> medical waste business in Europe.  In addition, we acquired the
> minority interest of our Medan S.A. de C.V. subsidiary in Mexico
> and became the sole owner of our Medam B.A. subsidiary in
> Argentina, previously accounted for as a minority interest using the
> equity method of accounting.

11.    Discovery is need on the issue of whether Nicklin Associates in able to pay a

judgment. At this point we only have its say so. Discovery is needed to determine what Stericycle

did with the assets after the stock purchase. There is no way for Ware to know at this time.

12.    Ware will pursue the facts relevant to ability of Nicklin Associates to pay a

judgment in this matter.

Respectfully submitted,

Dated: March 17, 2008

\_\_\_\_/s/_____
C. Michael Tarone, D.C. Bar # 159228
Karl & Tarone
900 17th Street, NW, Suite 1250
Washington, DC 20006
Tel. (202) 293-3200
Fax (202)429-1851)


Counsel for Plaintiff
GLORIA J. WARE

## DECLARATION OF GLORIA WARE

I, Gloria Ware, swear under penalty of perjury that the following are true and correct

1.  Before I filed my original charge of discrimination with the EEOC, I told 3 co–workers that I was doing so:

    (a)  Charles Marshall;
    (b)  Caesar Johnson; and
    (c)  Drew Crawford.

2.  After I filed my original charge of discrimination, either the same day or within a few days of filing, I told the following co–worker that I filed a charge of discrimination: Caesar Johnson. Other persons were also told.

3.  Approximately 3 weeks after I filed, Drew Crawford told me that John Nicklin knew at that time that I had filed a charge of discrimination. Crawford told me that John Nicklin knew!!! Marshall was a shift manager. Johnson was a shop steward. Crawford was a shift manager in the Baltimore office. That was within weeks of filing.

4.  John Nicklin, therefore, had knowledge that I filed a charge of discrimination weeks before I was immediately fired on Monday, April 18, 2005, soon after opening for business. The statement made to me that I was fired was made by Curtis Patton. My supervisor was John Nicklin. Curtis Patton was not my supervisor. At the time, Curtis Patton had the title of director of operations – but he was not my supervisor.

5.  At the time I was fired, I had a clean personnel record. I had no verbal or written notices of performance deficiencies or warnings.

6.  I was never subject to a company rule or policy that I was to present a written medical statement excusing an absence from work for medical reasons. There was no rule or company policy that required me to provide a written statement to support such an absence for medical reasons. In this instance, I was out for 1.5 days. The first time such an alleged rule or company policy was asserted was at the opening of business on Monday, April 18, 2005, when I was fired.

7.  Without advance warning, Curtis Patton demanded a written medical excuse on Monday, following my medical leave of Thursday (1/2 day) and Friday, April 18, 2005.

8.  The firing of Charles Marshall was witnessed by me. The typed explanation for termination was prepared outside my presence, in advance, and brought to the office by John Nicklin that day. Marshall, in my presence, denied using the words "cracker" and "whitey," denied sending home the 3 workers – who were black – against the orders of John Nicklin, or any other wrongdoing. John Nicklin fired Marshall – supposedly on the basis of Nicklin's written explanation – allegedly because Marshall was a black racist, allegedly Marshall showed his anti–white views by using the white racist words "whitey" and "cracker," and that he charged Nicklin Associates for one–day's labor of 3 black men (approximately 3) who did not work.

Page 1 of 2

*Gloria Ware*

EX B

Nicklin is a white–owned company (then owned by John Nicklin and David LeBlanc, who are white). The so called 3–way telephone call referenced involves hearsay.

9.  John Nicklin called me at home in the evening of the day I was fired, Monday, 4/18/05, and he stated that he knew that I had filed my charge which was before the date I was fired.

10. John Nicklin routinely referred to blacks in my presence at work and on the phone with racist, derogatory slurs, and he rejected my requests <u>not</u> to do so. He did not stop. LeBlanc engaged in the same conduct.

11. The work environment was <u>abusive</u>, <u>hostile</u>, <u>racist</u> and condoned by John Nicklin and David LeBlanc.

Dated: 8/21/07

Gloria Ware
Gloria Ware

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLOMBIA

Gloria Jean Ware,                           )
                                            )
               Plaintiff,                   )        CASE No: 1:08-cv-00233-RBW
                                            )
               v.                           )
                                            )
Nicklin Associates, Inc., *et al.*          )
                                            )
               Defendants.                  )
                                            )

## SECOND DECLARATION OF GLORIA J. WARE

I, Gloria Jean Ware, swear under penalty of perjury that the following statements are true and correct and based on my personal knowledge:

1.     While employed by Nicklin Associates, Inc., I was unaware of Stericycle, Inc. but I had personal knowledge that John Nicklin and Dave LeBlanc, who where the owners, were selling the company.

2     Nicklin Associates employees continuing to work under Stericycle include Caesar Johnson, Linwood Glenn, Leslie Parker, Curtis Patton, George Fox and John Nicklin. Both Patton and Parker are supervisors and Johnson is shop steward and team leader.

3.     Operations at Washington Hospital Center continue.

4.     John Nicklin continues to be involved in Stericycle's operations but is now based in Baltimore. Patton, Parker and Johnson were supervisors under Nicklin Associates.

5.     Attached are pages of the 2007 10-K report obtained from the internet.

SO DECLARED.

Dated: March 17, 2008                    *Gloria Jean Ware*
                                         GLORIA JEAN WARE

Ex. C

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 10-K

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2007

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission File Number 0-21229

# Stericycle, Inc.
### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **36-3640402** |
| (State or other jurisdiction of incorporation or organization) | (IRS Employer Identification Number) |

**28161 North Keith Drive**
**Lake Forest, Illinois 60045**
(Address of principal executive offices including zip code)

**(847) 367-5910**
(Registrant's telephone number, including area code)

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☒   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Act of 1934.   Yes ☐   No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15 (d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K, or any amendment to this Form 10-K.   ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See the definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one)

Large accelerated filer ☒   Accelerated filer ☐   Non-accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Exchange Act Rule 12b-2 of the Exchange Act).   Yes ☐   No ☒

The aggregate market value of voting and non-voting common equity held by non-affiliates computed by reference to the price at which common equity was last sold as of the last business day of the registrant's most recently completed second fiscal quarter (June 30, 2007) was: $3,891,770.

On February 21, 2008, there were 87,484,623 shares of the Registrant's Common Stock outstanding.

### DOCUMENTS INCORPORATED BY REFERENCE

Information required by Items 10, 11, 12 and 13 of Part III of this Report is incorporated by reference from the Registrant's definitive Proxy Statement for the 2008 Annual Meeting of Stockholders to be held on May 29, 2008.



**Protecting People. Reducing Risk.**

Stericycle, Inc.

**2007 ANNUAL REPORT ON FORM 10-K**

**TABLE OF CONTENTS**

Page No.

**Part I.**

| | | |
|---|---|---|
| Item 1. | Business | 1 |
| Item 1A. | Risk Factors | 9 |
| Item 1B. | Unresolved Staff Comments | 12 |
| Item 2. | Properties | 12 |
| Item 3. | Legal Proceedings | 12 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 13 |

**Part II.**

| | | |
|---|---|---|
| Item 5. | Market Price of and Dividends on the Registrant's Common Equity and Related Stockholder Matters | 15 |
| Item 6. | Selected Consolidated Financial Data | 18 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 19 |
| Item 7A. | Quantitative and Qualitative Disclosures about Market Risk | 27 |
| Item 8. | Consolidated Financial Statements and Supplemental Data | 28 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 57 |
| Item 9A. | Controls and Procedures | 57 |
| Item 9B. | Other Information | 57 |

**Part III.**

| | | |
|---|---|---|
| Item 10. | Directors and Executive Officers of the Registrant | 58 |
| Item 11. | Executive Compensation | 58 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 58 |
| Item 13. | Certain Relationships and Related Transactions | 58 |
| Item 14. | Principal Accountant Fees and Services | 58 |

**Part IV.**

| | | |
|---|---|---|
| Item 15. | Exhibits and Financial Statement Schedules | 60 |

| | | |
|---|---|---|
| **Signature** | | 63 |

# PART I.

## Item 1. Business

Unless the context requires otherwise, "we," "us" or "our" refers to Stericycle, Inc. and its subsidiaries on a consolidated basis.

## Overview

We are in the business of managing regulated waste and providing an array of related services. We operate in the United States, Canada, Mexico, the United Kingdom, Ireland and Argentina.

For large-quantity generators of regulated waste such as hospitals and for pharmaceutical companies and distributors, we offer:

- our institutional regulated waste management services
- our *Bio Systems*® sharps management services to reduce the risk of needle sticks
- a variety of products and services for infection control
- our regulated returns management services for expired or recalled healthcare products

For small-quantity generators of regulated waste such as doctors' offices and for retail pharmacies, we offer:

- our regulated waste management services
- our *Steri-Safe*® Occupational Safety and Health Act and Health Insurance Portability and Accountability Act ("HIPAA") compliance programs
- a variety of products and services for infection control
- our regulated returns management services for expired or recalled healthcare products

We operate integrated national regulated waste management networks in the United States, Canada, Mexico, Argentina, the United Kingdom and Ireland. Our national networks include a total of 78 processing or combined processing and collection sites and 98 additional transfer, collection or combined transfer and collection sites.

Our regulated waste processing technologies include autoclaving, our proprietary electro-thermal-deactivation system ("ETD"), chemical treatment and incineration.

We serve approximately 394,600 customers worldwide, of which approximately 9,700 are large-quantity generators, such as hospitals, blood banks and pharmaceutical manufacturers, and approximately 384,900 are small-quantity generators, such as outpatient clinics, medical and dental offices, long-term and sub-acute care facilities and retail pharmacies.

We benefit from significant customer diversification. No one customer accounts for more than 2% of our total revenues, and our top 10 customers account for approximately 8% of total revenues.

## Industry Overview

Governmental legislation and regulation increasingly requires the proper handling and disposal of regulated waste. Regulated medical waste is generally any medical waste that can cause an infectious disease and includes: single-use disposable items, such as needles, syringes, gloves and other medical supplies; cultures and stocks of infectious agents; and blood and blood products. Regulated pharmaceutical waste consists of expired or recalled pharmaceuticals.

1

During 2007, we believe the size of the global regulated waste market for the services we provide was approximately $10.0 billion. We estimate that our global market share increased to 9.3% in 2007 from 7.9% in 2006. Industry growth is driven by a number of factors. These factors include:

- *Aging of Population:* The average age of the population in the countries we operate in is rising. As people age, they typically require more medical attention and a wider variety of tests, procedures and medications, leading to an increase in the quantity of regulated waste generated.

- *Pressure to Reduce Healthcare Costs:* The healthcare industry is under pressure to reduce costs. We believe that our services can help healthcare providers to reduce their handling and compliance costs and to reduce their potential liability for employee exposure to blood-borne pathogens and other infectious agents.

- *Environmental and Safety Regulation:* We believe that many businesses that are not currently using third party regulated waste services are unaware either of the need for proper training of employees or of the requirements of the Occupational Safety and Health Administration ("OSHA") regarding the handling of regulated waste. These businesses include manufacturing facilities, schools, restaurants, hotels and other businesses where employees may come into contact with blood-borne pathogens. Similarly, the proper handling of expired or recalled pharmaceuticals requires an expertise that many retail pharmacies lack or find inefficient to provide.

- *Shift to Off-Site Treatment:* We believe that patient care is continuing to shift from institutional higher-cost acute-care settings to less expensive, smaller, off-site treatment alternatives, with a resulting increase in the number of regulated waste generators that cannot treat their own regulated waste.

- *Control of Drug Diversion:* The U.S. Drug Enforcement Administration ("DEA") has recently emphasized improved control of the handling and shipment of controlled substances to prevent diversion and counterfeiting, thus increasing the utility to pharmaceutical manufacturers and distributors of a returns service for expired or recalled pharmaceuticals.

## Competitive Strengths

We believe that we benefit from the following competitive strengths, among others:

- *Broad Range of Services:* We offer our customers a broad range of services to help them develop systems and processes to manage their regulated waste safely and efficiently. For example, we have developed programs to help our customers ensure and maintain compliance with OSHA and HIPAA regulations.

- *Established National Network:* We believe that a network like ours would be very expensive and time-consuming for a competitor to develop.

- *Diverse Customer Base and Revenue Stability:* We have a very diverse customer base in all the markets in which we operate. We are also generally protected from the cost of regulatory changes and increases in fuel, insurance and other operating costs because our regulated waste contracts typically allow us to adjust our prices to reflect these cost increases.

- *Strong Sales Network and Proprietary Database:* We use both telemarketing and direct sales efforts to obtain new regulated waste customers. In addition, we have a large database of potential new small-quantity customers, which we believe gives us a competitive advantage in identifying and reaching this higher-margin sector.

- *Experienced Senior Management Team:* We have experienced leadership. Our six most senior executives collectively have over 150 years of management experience in the health care, consumer and waste management industries.

- *Ability to Integrate Acquisitions:* We have completed 135 acquisitions since 1993 and have demonstrated a consistent ability to integrate our acquisitions into our operations successfully.

2

Our goals are to strengthen our position as a leading provider of regulated waste and compliance services and to continue to improve our profitability. Components of our strategy to achieve these goals include:

- *Expand Range of Services and Products:* We believe that we continue to have opportunities to expand our business by increasing the range of products and services that we offer our existing regulated waste customers. For example, through our *Steri-Safe*® program, we now offer OSHA compliance services to small-quantity customers, and an acquisition in 2003 enabled us to market the *Bio Systems*® sharps management program to large-quantity customers in new geographic areas. We have expanded our regulated waste services to pharmaceutical companies and other large-quantity generators through a series of acquisitions in 2005 and 2006 of five businesses engaged in regulated returns and recall management services.

- *Improve Margins:* We intend to continue working to improve our margins by increasing our base of small-quantity customers and focusing on service strategies that more efficiently meet the needs of our large-quantity customers. We have succeeded in raising the percentage of our revenues from small-quantity customers from 33% of domestic medical waste revenues at the fourth quarter of 1996 to 63% for the year ended 2007.

- *Seek Complementary Acquisitions:* We intend to continue to seek opportunities to acquire businesses that expand our national networks in the United States and internationally and increase our customer base. We believe that selective acquisitions can enable us to improve our operating efficiencies through increased utilization of our service infrastructure.

## Acquisitions

We have substantial experience in evaluating potential acquisitions and determining whether a particular waste business can be integrated into our operations with minimal disruption. Once a business is acquired, we implement programs and procedures to improve customer service, sales, marketing, routing, equipment utilization, employee productivity, operating efficiency and overall profitability.

We completed 135 acquisitions from 1993 through 2007, with 100 in the United States and 35 internationally.

During 2007, we completed 19 acquisitions, of which ten were domestic medical waste businesses, one was a domestic assembler and distributor of containers that we use in our mail-back program, one was a medical waste business in Canada, six were medical waste businesses in Latin America, and one was a medical waste business in Europe. In addition, we acquired the minority interest of our Medam S.A. de C.V. subsidiary in Mexico and became the sole owner of our Medam B.A. subsidiary in Argentina, previously accounted for as a minority interest using the equity method of accounting.

## Services and Operations

*Collection and Transportation:* In many respects, our regulated waste business is one of logistics. Efficiency of collection and transportation of regulated waste is a critical element of our operations because it represents the largest component of our operating costs.

For regulated waste, we supply specially designed reusable leak-and-puncture-resistant plastic containers to most of our large-quantity customers and many of our larger small-quantity customers. To assure regulatory compliance, we will not accept regulated waste from customers unless it is properly packaged in containers that we have either supplied or approved.

We collect containers or corrugated boxes of regulated waste from our customers at intervals depending upon customer requirements, contract terms and volume of waste generated. The waste is then transported directly to one of our processing facilities or to one of our transfer stations where it is combined with other regulated waste and transported to a processing facility.

3

Transfer stations allow us to temporarily hold small loads of waste until they can be consolidated into full truckloads and transported to a processing facility. Our use of transfer stations in a "hub and spoke" configuration improves the efficiency of our collection and transportation operations by expanding the geographic area that a particular processing facility can serve and thereby increasing utilization of the facility by increasing the volume of waste that it processes.

We collect some expired or recalled pharmaceuticals from pharmacy shelves, but more typically, pharmacies ship them directly to our processing facilities.

*Processing and Disposal:* Upon arrival at a processing facility, containers or boxes of regulated waste are typically scanned to verify that they do not contain any unacceptable substances like radioactive material. Any container or box that is discovered to contain unacceptable waste is returned to the customer and the appropriate regulatory authorities are informed.

The regulated waste is then processed using one of our various treatment technologies. Upon completion of the particular process, the resulting waste or incinerator ash is transported for resource recovery, recycling or disposal in a landfill operated by an unaffiliated third party. We do not own any landfills. After plastic containers such as our *Steri-Tub®* or *Bio Systems®* containers have been emptied, they are washed, sanitized and returned to customers for re-use.

Upon receipt at a processing facility, expired or recalled pharmaceuticals are counted and logged, and controlled substances are stored securely. In accordance with the manufacturer's instructions, expired or recalled pharmaceuticals are then returned to the manufacturer or destroyed in compliance with applicable regulations.

*Documentation:* We provide complete documentation to our customers for all regulated waste that we collect in accordance with applicable regulations and customer requirements.

### Marketing and Sales

*Marketing Strategy:* We use both telemarketing and direct sales efforts to obtain new customers. In addition, our drivers may also participate in our regulated waste marketing efforts by actively soliciting small-quantity customers they service.

*Small-Quantity Customers:* We target small-quantity customers as a growth area of our regulated waste business. We believe that small-quantity regulated waste customers view the potential risks of failing to comply with applicable state and federal regulated waste regulations as disproportionate to the cost of the services that we provide. We believe that this factor has been the basis for the significantly higher gross margins that we have achieved with our small-quantity customers relative to our large-quantity customers. We believe that the same potential exists in processing returns of expired pharmaceuticals for smaller retail pharmacies.

*Steri-Safe®:* Our *Steri-Safe®* OSHA compliance program provides an integrated regulated waste management and compliance-assistance service for small-quantity customers who typically lack the internal personnel and systems to comply with OSHA blood-borne regulations. Customers for our *Steri-Safe®* service pay a predetermined subscription fee in advance for regulated waste collection and processing services and can also choose from available packages of training and education services and products designed to help them to comply with OSHA regulations. Approximately 117,000 small-quantity customers are enrolled in this program. We believe that the implementation of our *Steri-Safe®* service provides us with an enhanced opportunity to leverage our existing customer base through the program's prepayment structure and diversified product and service offerings.

*Mail-Back Program:* We also operate a "mail-back" program by which we can reach small-quantity regulated waste customers located in outlying areas that would be inefficient to serve using our regular route structure. Our mail-back program has allowed us to service customers as far away as Hawaii, Guam and the Virgin Islands. Mail-back programs are also used in home care patient settings.

4

*Large-Quantity Customers:* Our marketing efforts to large-quantity customers are conducted by account executives that are also able to provide consulting services to assist our large-quantity customers in training their employees on safety issues and implementing programs to improve waste segregation.

Our *Bio Systems*® sharps management offering can enhance our revenue and margins per large-quantity account. The *Bio Systems*® service can help our large-quantity customers eliminate plastic and cardboard from their waste stream while providing a safe and cost-effective way for them to deal with the disposal of their sharp objects (such as needles, syringes, etc.).

We offer hospital pharmacies an onsite collection service to assist them in accounting for and segregating expired or recalled pharmaceuticals.

*National Accounts:* As a result of our extensive geographic coverage, we are capable of servicing national account customers (i.e., customers requiring regulated waste services at various geographically dispersed locations).

*Contracts:* We have multi-year contracts with a large majority of our customers. We negotiate individual contracts with each large-quantity and small-quantity customer. Although we have a standard form of contract, particularly for small-quantity customers, terms may vary depending upon the customer's service requirements and the volume of regulated waste generated and, in some jurisdictions, statutory and regulatory requirements. Substantially all of our contracts with small-quantity customers contain automatic renewal provisions.

### International

We conduct regulated waste operations in Canada, Mexico, Argentina, the United Kingdom and Ireland. We began our operations in Canada and Mexico in 1998, in Argentina in 1999, in the United Kingdom in 2004 and in Ireland in 2006. We also have technology licensing agreements in Japan, Brazil and South Africa.

### Processing Technologies

We currently use both non-incineration technologies (autoclaving, chemical treatment and our proprietary ETD technology) and incineration technologies for treating regulated waste.

Stericycle was founded on the belief that there was a need for safe, secure and environmentally responsible management of regulated waste. From our beginning we have championed the use of non-incineration treatment technologies such as our ETD process. While we recognize that some state regulations currently in force mandate that some types of regulated waste must be incinerated, we also know from years of experience working with our customers that there are ways to reduce the amount of regulated waste that is ultimately incinerated. The most effective strategy that we have seen involves comprehensive education of our customers in waste minimization and segregation. Working in cooperation with our customers, we have made tremendous strides in moving away from incineration and towards alternate treatment technologies. At the end of 2007, incineration constituted approximately 9% of our treatment capacity in North America.

*Autoclaving;* Autoclaving treats regulated waste with steam at high temperature and pressure to kill pathogens. Autoclaving alone does not change the appearance of waste, and some landfill operators may not accept recognizable regulated waste, but autoclaving may be combined with a shredding or grinding process to render the regulated waste unrecognizable.

*ETD:* Our ETD treatment process includes a system for grinding regulated waste. After grinding, ETD uses an oscillating field of low-frequency radio waves to heat regulated waste to temperatures that destroy pathogens such as viruses, bacteria, fungi and yeast without melting the plastic content of the waste. ETD does not produce regulated air or water emissions.

5

*Incineration:* Incineration burns regulated waste at elevated temperatures and reduces it to ash. Incineration reduces the volume of waste, and it is the recommended treatment and disposal option for some types of regulated waste such as anatomical waste or residues from chemotherapy procedures. Air emissions from incinerators can contain certain byproducts that are subject to federal, state and, in some cases, local regulation. In some circumstances, the ash byproduct of incineration may be regulated.

*Chem-Clav:* Chemclaving treats regulated waste using high heat, pressure, and a steam auger to kill pathogens. The waste is treated in a sealed container while the auger shreds the waste, making it unrecognizable while exposing more surface area of the waste to the steam. After shredding and treatment, the waste residue is sterile and safe for landfill.

## Competition

The regulated waste industry is highly competitive, and barriers to entry into the regulated waste collection and disposal business and the pharmaceutical returns business are very low. Our competitors consist of many different types of service providers, including a large number of regional and local companies. In the regulated waste industry, another major source of competition is the on-site treatment of regulated waste by some large-quantity generators, particularly hospitals.

In addition, in the regulated waste industry we face potential competition from businesses that are attempting to commercialize alternate treatment technologies or products designed to reduce or eliminate the generation of regulated waste, such as reusable or degradable medical products.

## Governmental Regulation

The regulated waste industry is subject to extensive and frequently changing federal, state and local laws and regulations. This statutory and regulatory framework imposes a variety of compliance requirements, including requirements to obtain and maintain government permits. These permits grant us the authority, among other things:

- to construct and operate collection, transfer and processing facilities,
- to transport regulated waste within and between relevant jurisdictions, and
- to handle particular regulated substances.

Our permits must be periodically renewed and are subject to modification or revocation by the issuing authority.

We are also subject to regulations that govern the definition, generation, segregation, handling, packaging, transportation, treatment, storage and disposal of regulated waste. We are also subject to extensive regulations designed to minimize employee exposure to regulated waste.

*Domestic Federal Regulation:* Five federal agencies have authority over regulated waste. These agencies are the U.S. Environmental Protection Agency ("EPA"), OSHA, U.S. Department of Transportation ("DOT"), the U.S. Postal Service ("USPS") and DEA. These agencies supervise regulated waste under a variety of statutes and regulations. The principal statutes and regulations are:

- *Medical Tracking Act of 1988.* In the late 1980s, the EPA outlined a two-year demonstration program pursuant to the Medical Waste Tracking Act ("MWTA"), which was added to the Resource Conservation and Recovery Act of 1976. In regulations implementing the MWTA, the EPA defined medical waste and established guidelines for its segregation, handling, containment, labeling and transport. The MWTA demonstration program expired in 1991, but the MWTA established a model followed by many states in developing their specific medical waste regulatory framework.

6

- *Occupational Safety and Health Act of 1970.* The Occupational Safety and Health Act of 1970 authorizes OSHA to issue occupational safety and health standards. Various standards apply to certain aspects of our operations and govern such matters as exposure to blood borne pathogens and other potentially infectious materials.

- *Resource Conservation and Recovery Act of 1976.* The Resource Conservation and Recovery Act of 1976 ("RCRA") created standards for the generation, transportation, treatment, storage and disposal of solid and hazardous wastes. Medical wastes are currently considered non-hazardous solid wastes under RCRA. However, some substances collected by us from some of our customers, including photographic fixer developer solutions, lead foils and dental amalgam, are considered hazardous wastes.

- *Clean Air Act Regulations.* In August 1997, the EPA adopted regulations under the Clean Air Act Amendments of 1990 that limit the discharge into the atmosphere of pollutants released by regulated waste incineration. These regulations required every state to submit to the EPA for approval a plan to meet minimum emission standards for these pollutants. We currently operate seven incinerators in the United States. We believe these incinerators are in compliance with applicable state requirements.

- *DOT Regulations.* DOT has adopted regulations under the Hazardous Materials Transportation Authorization Act of 1994 that require us to package and label regulated waste in compliance with designated standards, and which incorporate blood borne pathogens standards issued by OSHA. Under these standards, we must, among other things, identify our packaging with a "biohazard" marking on the outer packaging, and our regulated waste container must be sufficiently rigid and strong to prevent tearing or bursting. It must also be puncture-resistant, leak-resistant, properly sealed and impervious to moisture.

  Expired or recalled pharmaceuticals are subject to the substantially same DOT regulations as medical waste. We identify these products by their National Drug Code number and classify them by their handling, transportation and disposal requirements.

- *Comprehensive Environmental Response, Compensation and Liability Act of 1980.* The Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA") established a regulatory and remedial program to provide for the investigation and cleanup of facilities that have released or threaten to release hazardous substances into the environment. CERCLA and state laws similar to it may impose strict, joint and several liability on the current and former owners and operators of facilities from which releases of hazardous substances have occurred and on the generators and transporters of the hazardous substances that come to be located at these facilities.

- *USPS Regulations.* We have obtained permits from the USPS to conduct our "mail-back" program, pursuant to which customers mail approved containers of "sharps" (needles, knives, broken glass and the like) directly to our treatment facilities.

- *Controlled Substances Act.* Our returns service for expired and recalled pharmaceuticals is required to comply with DEA regulations relating to the approval and permitting of processing facilities, management of employees engaged in the collection, processing and disposal of controlled substances, proper documentation and reporting to the DEA.

We use landfills owned and operated by unrelated third parties for the disposal of waste from our processing facilities.

**Domestic State and Local Regulation:** We conduct business in all 50 states and Puerto Rico. Each state has its own regulations related to the handling, treatment and storage of regulated waste. Although there are many differences among the various state laws and regulations, for regulated waste many states have followed the model under the MWTA and have implemented programs under RCRA. In each state where we operate a processing facility or a transfer station, we are required to comply with numerous state and local laws and regulations as well as our operating plan for each site. In addition, many local governments have ordinances and regulations, such as zoning and health regulations that affect our operations.

We maintain numerous governmental permits and licenses to conduct our business. Our permits vary from state to state based upon our activities within that state and on the applicable state and local laws and regulations.

*Foreign Regulation:* We are subject to substantial regulation by the governments of the foreign jurisdictions in which we conduct regulated waste operations. The statutory and regulatory requirements vary from jurisdiction to jurisdiction.

## Patents and Proprietary Rights

We consider the protection of our technology to be important to our business. Our policy is to protect our technology by a variety of means, including applying for patents in the United States and in other foreign countries.

We hold 7 current United States patents relating to the ETD treatment process and other aspects of processing regulated waste. We have filed or have been assigned patent applications in several foreign countries and we have received patents in Australia, Canada, Denmark, France, Ireland, Italy, Japan, Mexico, South Africa, South Korea, Spain, Sweden and the United Kingdom.

The term of the first-to-end of our existing United States patents relating to our ETD treatment process will currently end in May 2009 and the term of the last-to-end will currently end in January 2019.

We own federal registrations of the trademarks "Steri-Fuel®", "Steri-Plastic®", "Steri-Tub®", "Direct Return®", "Steri-Safe®", the service mark Stericycle® and a service mark consisting of a nine-circle design.

## Potential Liability and Insurance

The regulated waste industry involves potentially significant risks of statutory, contractual, tort and common law liability claims. Potential liability claims could involve, for example:

- cleanup costs;
- personal injury;
- damage to the environment;
- employee matters;
- property damage; or
- alleged negligence or professional errors or omissions in the planning or performance of work.

We could also be subject to fines or penalties in connection with violations of regulatory requirements.

We carry $35 million of liability insurance (including umbrella coverage), and under a separate policy, $10 million of aggregate pollution and legal liability insurance ($5 million per incident), which we consider sufficient to meet regulatory and customer requirements and to protect our employees, assets and operations.

## Employees

As of December 31, 2007, we had 6,090 full-time and 252 part-time employees, of which 4,569 were employed in the United States and 1,773 internationally. Approximately 355 of our U.S. drivers, transportation helpers and plant workers are covered by a total of seven collective bargaining agreements with local unions of the International Brotherhood of Teamsters. These agreements expire at various dates from April 2007 to November 2010. We consider our employee relations to be satisfactory.

8

**Website Access**

We maintain an Internet website, *www.stericycle.com*, providing a variety of information about us. Our annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and amendments to those reports, that we file with the Securities and Exchange Commission are available, as soon as reasonably practicable after filing, at the investors' page on our website, or by a direct link to our filings on the SEC's free website, *www.sec.gov*.

**Item 1A. Risk Factors**

*We are subject to extensive governmental regulation, which is frequently difficult, expensive and time-consuming to comply with.*

The regulated waste management industry is subject to extensive federal, state and local laws and regulations relating to the collection, transportation, packaging, labeling, handling, documentation, reporting, treatment and disposal of regulated waste. Our business requires us to obtain many permits, authorizations, approvals, certificates or other types of governmental permission from every jurisdiction where we operate. We believe that we currently comply in all material respects with all applicable permitting requirements. State and local regulations change often, however, and new regulations are frequently adopted. Changes in the regulations could require us to obtain new permits or to change the way in which we operate under existing permits. We might be unable to obtain the new permits that we require, and the cost of compliance with new or changed regulations could be significant.

Many of the permits that we require, especially those to build and operate processing plants and transfer facilities, are difficult and time-consuming to obtain. They may also contain conditions or restrictions that limit our ability to operate efficiently, and they may not be issued as quickly as we need them (or at all). If we cannot obtain the permits that we need when we need them, or if they contain unfavorable conditions, it could substantially impair our operations and reduce our revenues.

*The handling and treatment of regulated waste carries with it the risk of personal injury to employees and others.*

Our business requires us to handle materials that may be infectious or hazardous to life and property in other ways. While we try to handle such materials with care and in accordance with accepted and safe methods, the possibility of accidents, leaks, spills, and acts of God always exists. Examples of possible exposure to such materials include:

- truck accidents;
- damaged or leaking containers;
- improper storage of regulated waste by customers;
- improper placement by customers of materials into the waste stream that we are not authorized or able to process, such as certain body parts and tissues; or
- malfunctioning treatment plant equipment.

Human beings, animals or property could be injured, sickened or damaged by exposure to regulated waste. This in turn could result in lawsuits in which we are found liable for such injuries, and substantial damages could be awarded against us.

While we carry liability insurance intended to cover these contingencies, particular instances may occur that are not insured against or that are inadequately insured against. An uninsured or underinsured loss could be substantial and could impair our profitability and reduce our liquidity.

*The handling of regulated waste exposes us to the risk of environmental liabilities, which may not be covered by insurance.*

As a company engaged in regulated waste management, we face risks of liability for environmental contamination. The federal Comprehensive Environmental Response, Compensation and Liability Act of 1980, or CERCLA, and similar state laws impose strict liability on current or former owners and operators of facilities that release hazardous substances into the environment as well as on the businesses that generate those substances and the businesses that transport them to the facilities. Responsible parties may be liable for substantial investigation and clean-up costs even if they operated their businesses properly and complied with applicable federal and state laws and regulations. Liability under CERCLA may be joint and several, which means that if we were found to be a business with responsibility for a particular CERCLA site, we could be required to pay the entire cost of the investigation and clean-up even though we were not the party responsible for the release of the hazardous substance and even though other companies might also be liable.

Our pollution liability insurance excludes liabilities under CERCLA. Thus, if we were to incur liability under CERCLA and if we could not identify other parties responsible under the law whom we are able to compel to contribute to our expenses, the cost to us could be substantial and could impair our profitability and reduce our liquidity. Our customer service agreements make clear that the customer is responsible for making sure that only appropriate materials are disposed of. If there were a claim against us that a customer might be legally liable for, we might not be successful in recovering our damages from the customer.

*The level of governmental enforcement of environmental regulations has an uncertain effect on our business and could reduce the demand for our services.*

We believe that the government's strict enforcement of laws and regulations relating to regulated waste collection and treatment has been good for our business. These laws and regulations increase the demand for our services. A relaxation of standards or other changes in governmental regulation of regulated waste could increase the number of competitors or reduce the need for our services.

*If we are unable to acquire other regulated waste businesses, our revenue and profit growth may be slowed.*

Historically our growth strategy has been based in substantial part on our ability to acquire other regulated waste businesses. We do not know whether in the future we will be able to:

- identify suitable businesses to buy;
- complete the purchase of those businesses on terms acceptable to us;
- improve the operations of the businesses that we do buy and successfully integrate their operations into our own; or
- avoid or overcome any concerns expressed by regulators.

We compete with other potential buyers for the acquisition of other regulated waste companies. This competition may result in fewer opportunities to purchase companies that are for sale. It may also result in higher purchase prices for the businesses that we want to purchase.

We also do not know whether our growth strategy will continue to be effective. Our business is significantly larger than before, and new acquisitions may not have the desired benefits that we have obtained in the past.

*The implementation of our acquisition strategy could be affected in certain instances by the concerns of state regulators, which could result in our not being able to realize the full synergies or profitability of particular acquisitions.*

We may become subject to inquiries and investigations by state antitrust regulators from time to time in the course of completing acquisitions of other regulated waste businesses. In order to obtain regulatory clearance for

10

a particular acquisition, we could be required to modify certain operating practices of the acquired business or to divest ourselves of one or more assets of the acquired business. Changes in the terms of our acquisitions required by regulators or agreed to by us in order to settle regulatory investigations could impede our acquisition strategy or reduce the anticipated synergies or profitability of our acquisitions. The likelihood and outcome of inquiries and investigations from state regulators in the course of completing acquisitions cannot be predicted.

### *Aggressive pricing by existing competitors and the entrance of new competitors could drive down our profits and slow our growth.*

The regulated waste industry is very competitive because of low barriers to entry, among other reasons. This competition has required us in the past to reduce our prices, especially to large account customers, and may require us to reduce our prices in the future. Substantial price reductions could significantly reduce our earnings.

We face direct competition from a large number of small, local competitors. Because it requires very little money or technical know-how to compete with us in the collection and transportation of regulated waste, there are many regional and local companies in the industry. We face competition from these businesses, and competition from them is likely to exist in the new locations to which we may expand in the future. In addition, large national companies with substantial resources may decide to enter the regulated waste industry. For example, Waste Management, Inc., a major solid waste treatment company, announced in February 2005 that it intended to begin offering regulated waste management services to hospitals and possibly other large quantity generators of regulated waste.

Our competitors could take actions that would hurt our growth strategy, including the support of regulations that could delay or prevent us from obtaining or keeping permits. They might also give financial support to citizens' groups that oppose our plans to locate a treatment or transfer facility at a particular location.

### *Restrictions in our senior unsecured credit facility may limit our ability to pay dividends, incur additional debt, make acquisitions and make other investments.*

Our senior unsecured credit facility contains covenants that restrict our ability to make distributions to stockholders or other payments unless we satisfy certain financial tests and comply with various financial ratios.

It also contains covenants that limit our ability to incur additional indebtedness, acquire other businesses and make capital expenditures, and imposes various other restrictions. These covenants could affect our ability to operate our business and may limit our ability to take advantage of potential business opportunities as they arise.

### *The loss of our senior executives could affect our ability to manage our business profitably.*

We depend on a small number of senior executives. Our future success will depend upon, among other things, our ability to keep these executives and to hire other highly qualified employees at all levels. We compete with other potential employers for employees, and we may not be successful in hiring and keeping the executives and other employees that we need. We do not have written employment agreements with any of our executive officers, and officers and other key employees could leave us with little or no prior notice, either individually or as part of a group. Our loss of or inability to hire key employees could impair our ability to manage our business and direct its growth.

### *Our expansion into foreign countries exposes us to unfamiliar regulations and may expose us to new obstacles to growth.*

We plan to grow both in the United States and in foreign countries. We have established operations in Argentina, Canada, Ireland, Mexico and the United Kingdom. Foreign operations carry special risks. Although our business in foreign countries has not yet been affected, our business in the countries in which we currently operate and those in which we may operate in the future could be limited or disrupted by:

- government controls;
- import and export license requirements;

11

- political or economic instability;

- trade restrictions;

- changes in tariffs and taxes;

- exchange rate fluctuations;

- our unfamiliarity with local laws, regulations, practices and customs;

- restrictions on repatriating foreign profits back to the United States;

- difficulties in staffing and managing international operations.

Foreign governments and agencies often establish permit and regulatory standards different from those in the United States. If we cannot obtain foreign regulatory approvals, or if we cannot obtain them when we expect, our growth and profitability from international operations could be limited. Fluctuations in currency exchange could have similar effects.

***Our earnings could decline if we write-off intangible assets, such as goodwill.***

As a result of purchase accounting for our various acquisitions, our balance sheet at December 31, 2007 contains goodwill of $1,033.3 million and other intangible assets, net of accumulated amortization, of $152.7 million (including indefinite lived intangibles of $52.8 million). In accordance with Statement of Financial Accounting Standards No. 142 "Goodwill and Other Intangible Assets" ("SFAS No. 142"), we evaluate on an ongoing basis whether facts and circumstances indicate any impairment of the value of indefinite-lived intangible assets such as goodwill. As circumstances after an acquisition can change, we may not realize the value of these intangible assets. If we were to determine that a significant impairment has occurred, we would be required to incur non-cash write-offs of the impaired portion of goodwill and other unamortized intangible assets, which could have a material adverse effect on our results of operations in the period in which the write-off occurs.

## Item 1B. Unresolved Staff Comments

None.

## Item 2. Properties

We lease office space for our corporate offices in Lake Forest, Illinois. In North America we own or lease 3 ETD processing facilities, 12 incineration processing facilities, 34 autoclave processing facilities and 4 other processing facilities. All of our processing facilities also serve as collection sites. We own or lease 93 additional transfer and collection sites and 20 additional sales/administrative sites. In Europe we own or lease 10 incineration processing facilities and 9 autoclave processing facilities. We also lease 5 additional transfer and collection sites and 2 administrative sites. In Argentina we own or lease one administrative site, one ETD processing facility and 5 processing facilities, which use a combination of both incineration and autoclave treatments. We consider that these processing facilities are adequate for our present and anticipated needs.

We do not own or operate any landfills or any other type of disposal site. After processing, all remaining waste materials are transported to unaffiliated third parties for permanent disposal.

## Item 3. Legal Proceedings

We operate in a highly regulated industry and must deal with regulatory inquiries or investigations from time to time that may be instituted for a variety of reasons. We are also involved in a variety of civil litigation from time to time.

12

In November 2007, the arbitrator issued a final award in arbitration proceedings in Australia with SteriCorp Limited that we have previously reported. The arbitrator awarded Stericycle $8.2 million USD on our claim against SteriCorp for payments due under certain convertible notes and awarded SteriCorp $14.5 million USD on its claim that we failed to supply SteriCorp with equipment conforming to specifications under an equipment supply agreement. The final award also requires us to pay two-thirds of SteriCorp's arbitration costs. An estimate of these amounts has been made and accrued for in our consolidated financial statements. The net effect of the various components of the final arbitration award was a charge of $13.9 million to our income statement identified as "Arbitration award and related costs."

A United Kingdom subsidiary of ours is currently involved in arbitration proceedings with Daniels Corporation (UK) Limited over White Rose Sharpsmart Limited, a joint venture in which our subsidiary has a 50% interest. We do not believe that these proceedings are material.

## Item 4. Submission of Matters to a Vote of Security Holders

No matter was submitted to a vote of our stockholders during the fourth quarter of 2007.

## Supplemental Information

## Executive Officers of the Registrant

The following table contains certain information regarding our five current executive officers:

| Name | Position | Age |
|---|---|---|
| Mark C. Miller | President, Chief Executive Officer and Director | 52 |
| Richard T. Kogler | Executive Vice President and Chief Operating Officer | 48 |
| Frank J.M. ten Brink | Executive Vice President and Chief Financial Officer | 51 |
| Richard L. Foss | Executive Vice President, Corporate Development | 53 |
| Shan S. Sacranie | Executive Vice President, International | 55 |
| Michael J. Collins | President, Stericycle Return Management Services | 51 |

Mark C. Miller has served as our President and Chief Executive Officer and a director since joining us in May 1992. From May 1989 until he joined us, Mr. Miller served as vice president for the Pacific, Asia and Africa in the International Division of Abbott Laboratories, which he joined in 1976 and where he held a number of management and marketing positions. Mr. Miller received a B.S. degree in computer science from Purdue University, where he graduated Phi Beta Kappa.

Richard T. Kogler joined us as Chief Operating Officer in December 1998. From May 1995 through October 1998, Mr. Kogler was vice president and chief operating officer of American Disposal Services, Inc., a solid waste management company. From October 1984 through May 1995, Mr. Kogler served in a variety of management positions with Waste Management, Inc. Mr. Kogler received a B.A. degree in chemistry from St. Louis University.

Frank J.M. ten Brink has served as our Executive Vice President, Finance and Chief Financial Officer since June 1997. From 1991 until 1996 he served as chief financial officer of Hexacomb Corporation, and from 1996 until joining us, he served as chief financial officer of Telular Corporation. Prior to 1991, he held various financial management positions with Interlake Corporation and Continental Bank of Illinois. Mr. ten Brink received a B.B.A. degree in international business and a M.B.A. degree in finance from the University of Oregon.

13

Richard L. Foss has served as our Executive Vice President for Corporate Development since February 2003. From 1999 to 2002, Mr. Foss was a vice president and director of worldwide product marketing in the personal communication sector at Motorola Inc., and from 1977 until 1999, he held a number of management and marketing positions at The Procter & Gamble Company, including serving as a vice president and general manager in the health care segment. Mr. Foss received a B.S. degree in chemistry and an M.B.A degree from Rensselear Polytechnic Institute.

Shan S. Sacranie joined us in May 2003 and became our Executive Vice President, International in November 2003. From 2001 to 2002 he was chief executive for Appliance Controls Group, Inc. and from 1995 to 2001, he was president of Oak Industries Inc. From 1978 to 1995 he held a number of management positions for Honeywell. Mr. Sacranie holds a BA degree (Hons) in economics from the University of Bombay, an M.B.A. degree from Minnesota State University and a J.D. from the William Mitchell College of Law.

Michael J. Collins has served as President of our Return Management Services Division since June 2006. Prior to joining us, he served at Abbott Laboratories, a diversified health care company, which he joined in 1982 and where he held a number of management and marketing positions, most recently as vice president, medical products group health systems. Mr. Collins received a B.A. degree in business and education from the University of New Haven and a M.B.A. degree in business administration from National University.

# PART II.

## Item 5. Market Price of and Dividends on the Registrant's Common Equity and Related Stockholder Matters

As of February 21, 2007, we had approximately 194 stockholders of record. The Company's stock trades on the NASDAQ National Market under the ticker symbol SRCL.

During the quarter ended June 30, 2007 our shareholders approved the increase in our authorized shares of common stock from 80,000,000 shares to 120,000,000 shares. In addition, our Board of Directors authorized a 2-for-1 stock split. The stock split was in the form of a stock dividend of one share payable on May 31, 2007 in respect of each share of common stock outstanding on the record date of May 17, 2007. Historic share and per share amounts have been adjusted to reflect the stock split.

The following table provides the high and low sales prices of our Common Stock for each calendar quarter during our two most recent fiscal years:

| Quarter | High | Low |
|---|---|---|
| First quarter 2006 | $33.81 | $28.64 |
| Second quarter 2006 | 34.50 | 30.65 |
| Third quarter 2006 | 34.90 | 30.54 |
| Fourth quarter 2006 | $37.81 | $33.00 |
| First quarter 2007 | $41.12 | $36.59 |
| Second quarter 2007 | 45.59 | 40.78 |
| Third quarter 2007 | 57.16 | 43.27 |
| Fourth quarter 2007 | $61.87 | $52.04 |

We did not pay any cash dividends during 2007 and have never paid any dividends on our common stock. We currently expect that we will retain future earnings for use in the operation and expansion of our business and do not anticipate paying any cash dividends in the foreseeable future. See Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations."

In May 2002 our Board of Directors authorized the Company to repurchase up to 6,000,000 shares of our common stock, in the open market or through privately negotiated transactions, at times and in amounts in the Company's discretion.

In February 2005, at a time when we had purchased a total of 2,956,860 shares, the Board authorized us to purchase an additional 2,956,860 shares.

In February 2007, at a time when we had purchased an additional 3,142,080 shares since the prior increase in authorization, the Board authorized us to purchase up to an additional 3,142,080 shares.

In May 2007, at a time when we had purchased an additional 1,187,142 shares since the prior increase in authorization, the Board authorized us to purchase up to an additional 1,187,142 shares, thereby again giving the Company the authority to purchase up to a total of 6,000,000 additional shares.

15

The following table provides information about our purchases of shares of our common stock during the year ended December 31, 2007:

### Issuer Purchase of Equity Securities

| Period | Total Number of Share (or Units) Purchased | Average Price Paid per Share (or Unit) | Number of Shares (or Units) Purchased as Part of Publicly Announced Plans or Programs | Maximum Number (or Approximate Dollar Value) of Shares (or Units) that May Yet Be Purchased Under the Plans or Programs |
|---|---|---|---|---|
| January 1 - January 31, 2007 . . . . . . . . . . . . . . . | 0 | $ 0 | 0 | 2,857,920 |
| February 1 - February 28, 2007 . . . . . . . . . . . . . | 264,000 | 39.30 | 264,000 | 5,736,000 |
| March 1 - March 31, 2007 . . . . . . . . . . . . . . . . . | 915,572 | 38.99 | 915,572 | 4,820,428 |
| April 1 - April 30, 2007 . . . . . . . . . . . . . . . . . . . | 7,570 | 40.53 | 0 | 4,812,858 |
| May 1 - May 31, 2007 . . . . . . . . . . . . . . . . . . . . | 0 | 0 | 0 | 6,000,000 |
| June 1 - June 30, 2007 . . . . . . . . . . . . . . . . . . . | 283,996 | 43.25 | 283,996 | 5,716,004 |
| July 1 - July 31, 2007 . . . . . . . . . . . . . . . . . . . . | 39,965 | 43.46 | 39,965 | 5,676,039 |
| August 1 - August 31, 2007 . . . . . . . . . . . . . . . . | 717,254 | 48.49 | 717,254 | 4,958,785 |
| September 1 - September 30, 2007 . . . . . . . . . . | 0 | 0 | 0 | 4,958,785 |
| October 1 - October 31, 2007 . . . . . . . . . . . . . . | 158,314 | 53.17 | 158,314 | 4,800,471 |
| November 1 - November 30, 2007 . . . . . . . . . . . | 1,600 | 55.04 | 1,600 | 4,798,871 |
| December 1 - December 31, 2007 . . . . . . . . . . . | 0 | $ 0 | 0 | 4,798,871 |

### Equity Compensation Plans

The following table summarizes information as of December 31, 2007 relating to our equity compensation plans pursuant to which stock option grants, restricted stock awards or other rights to acquire shares of our common stock may be made or issued:

### Equity Compensation Plan Information

| Plan Category | Number of Securities to be Issued Upon Exercise of Outstanding Options, Warrants and Rights (a) | Weighted-Average Exercise Price of Outstanding Options, Warrants and Rights (b) | Number of Securities Remaining Available for Future Issuance Under Equity Compensation Plans (Excluding Securities Reflected in Column (a)) (c) |
|---|---|---|---|
| Equity compensation plans approved by our security holders(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4,757,128 | $27.42 | 2,601,536 |
| Equity compensation plans not approved by our security holders(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,501,667 | $21.66 | 403,086 |

(1) These plans consist of our 2005 Incentive Stock Plan, 1997 Stock Option Plan, , Directors Stock Option Plan and the Employee Stock Purchase Plan.
(2) The only plan in this category is our 2000 Nonstatutory Stock Option Plan.

In 2000, our Board of Directors approved the 2000 Nonstatutory Stock Option Plan (the "2000 Plan"), which authorized the granting of nonstatutory stock options for 7,000,000 shares of our common stock to employees (but not to officers or directors). See Note 12 to the Consolidated Financial Statements for a description of this plan.

16

**Performance Graph**

The following graph compares the cumulative total return (i.e., stock price appreciation plus dividends) on our common stock over the five-year period ending December 31, 2007 with the cumulative total return for the same period on the Nasdaq National Market Composite Index, the Russell 3000 Index and an index of a peer group of companies that we selected consisting of Allied Waste Industries, Inc., SRI/Surgical Express, Inc. (formerly Sterile Recoveries, Inc.), Steris Corporation and Waste Management, Inc. The graph assumes that $100 was invested on December 31, 2002 in our common stock and in the stock represented by each of the three indexes, and that all dividends were reinvested.

The stock price performance of our common stock reflected in the following graph is not necessarily indicative of future performance.



17

**Item 6. Selected Consolidated Financial Data**

| | 2007 | 2006(3) | 2005 | 2004 | 2003 |
|---|---|---|---|---|---|
| | **Years Ended December 31,** | | | | |
| | Dollars in thousands, except per share data | | | | |
| **Statement of Income Data(1)** | | | | | |
| Revenues ............................. | $ **932,767** | $ 789,637 | $ 609,457 | $ 516,228 | $453,225 |
| Income from operations ................... | **224,544** | 201,762 | 166,532 | 145,655 | 126,397 |
| Net income ........................... | **118,378** | 105,270 | 67,154 | 78,178 | 65,781 |
| Net income applicable to common stock ...... | **118,378** | 105,270 | 67,154 | 78,178 | 65,781 |
| Diluted net income per share of common stock(2) ........................... | **1.32** | 1.16 | 0.74 | 0.85 | 0.71 |
| Depreciation and amortization .............. | **31,137** | 27,036 | 21,431 | 21,803 | 17,255 |
| **Other Data** | | | | | |
| Cash provided by operating activities ........ | $ **174,042** | $ 160,162 | $ 94,327 | $ 114,611 | $123,887 |
| Cash used in investing activities ............ | **(135,261)** | (201,425) | (156,001) | (105,093) | (57,635) |
| Cash (used in)/ provided by financing activities ............................. | **(32,635)** | 52,547 | 59,500 | (6,941) | (66,820) |
| **Balance Sheet Data(1)** | | | | | |
| Cash, cash equivalents and short-term investments ......................... | $ **18,364** | $ 16,040 | $ 8,545 | $ 7,949 | $ 7,881 |
| Total assets .............................. | **1,608,159** | 1,327,906 | 1,047,660 | 834,141 | 707,462 |
| Long-term debt, net of current portion ....... | **613,781** | 443,115 | 348,841 | 190,431 | 163,016 |
| Convertible redeemable preferred stock ...... | **—** | — | — | — | 20,944 |
| Shareholders' equity ..................... | $ **714,075** | $ 625,081 | $ 521,634 | $ 495,372 | $407,820 |

(1) See Note 3 to the Consolidated Financial Statements for information concerning our acquisitions during the three years ended December 31, 2007.

(2) See Note 11 to the Consolidated Financial Statements for information concerning the computation of net income per common share.

- In 2007, net income includes nonrecurring costs (net of tax) of $9.3 million, of which $7.7 million were net non-cash items. These costs negatively impacted diluted earnings per share ("EPS") by $0.10, related to the following:

  i.   We recognized legal settlement expense related to the arbitration award in Australia, including expected arbitration cost reimbursements to be paid in 2008;

  ii.  We wrote down our investment in Medam, B.A., an Argentine joint venture. The write down of our investment in Argentina was a result of the legal restructuring of the business operations;

  iii. We wrote down the White Rose Environmental tradename as a result of the name change of our subsidiary in the United Kingdom;

  iv.  We wrote down the permit intangible for a treatment facility in the United Kingdom that was no longer being used;

  v.   We wrote down equipment that had been permanently idled;

  vi.  We recorded a gain on the divestiture of selected assets of Sterile Technologies, Ltd., one of our subsidiaries in the United Kingdom;

  vii. We received proceeds from two of our insurance carriers for coverage related to the 3CI Complete Compliance Corporation ("3CI") class action litigation settlement;

  viii. We divested the over the counter products portion of our Scherer Labs assets which resulted in a gain.

- In 2006, net income includes costs (net of tax) related to a fixed asset write-down of equipment of $0.2 million, write-down of an investment in securities of $0.6 million, partially offset by income recorded from insurance proceeds related to the 3CI settlement of $0.6 million. The net amount of $0.2 million did not affect EPS.

18

- In 2005, net income includes costs (net of tax) related to the 3CI preliminary settlement of class action litigation of $23.4 million, South Africa note receivable write-down of $1.5 million, fixed asset impairments of $0.5 million, settlement of licensing litigation of $1.1 million, and items related to debt restructuring of $0.3 million which negatively impacted EPS by $0.30 per share. Of the total of $26.8 million of such items, $3.4 million were non-cash items.
- In 2004, net income includes fixed asset write-offs of $0.7 million, and items related to debt restructuring and redemption of senior subordinated debt of $2.8 million that negatively impacted EPS by $0.04 per share.
- In 2003, net income includes debt restructuring and subordinated debt repurchase of $2.0 million (net of tax), which negatively impacted EPS by $0.02 per share.

(3) On January 1, 2006, we adopted the provisions of SFAS No. 123R, "Share-Based Payment" ("SFAS No. 123R") using the modified prospective method to account for stock compensation costs. SFAS No. 123R requires the measurement and recognition of compensation expense for all stock-based payment awards made to our employees and directors. During the years ended December 31, 2007 and 2006, we recognized stock compensation expense (net of tax) of $6.6 million and $6.5 million, respectively. See Note 12 to the Consolidated Financial Statements for additional information related to stock compensation expense.

## Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operation

The following discussion of our financial condition and results of operations should be read in conjunction with our consolidated financial statements and related notes in Item 8 of this Report.

### Introduction

We are in the business of managing regulated waste and providing an array of related services. We operate in the United States, the United Kingdom, Mexico, Canada, Ireland and Argentina.

For large-quantity generators of regulated waste such as hospitals and for pharmaceutical companies and distributors, we offer: our institutional medical waste management services; our *Bio Systems*® sharps management services to reduce the risk of needle sticks; a variety of products and services for infection control; and our regulated returns management services for expired or recalled products.

For small-quantity generators of regulated waste such as doctors' offices and for retail pharmacies, we offer: our medical waste management services; our *Steri-Safe*® Occupational Safety and Health Act and HIPAA compliance programs; a variety of products and services for infection control; and our pharmaceutical returns services for expired or recalled pharmaceuticals.

We operate integrated national medical waste management networks in the United States, Canada, Mexico, Argentina, the United Kingdom and Ireland. Our national networks include a total of 78 processing or combined processing and collection sites and 98 additional transfer, collection or combined transfer and collection sites.

Our medical waste processing technologies include autoclaving, our proprietary ETD, chemical treatment and incineration.

As of December 31, 2007, we served approximately 394,600 customers, of which approximately 384,900 were small quantity customers and approximately 9,700 were large quantity customers.

### Critical Accounting Policies and Estimates

Our discussion and analysis of our financial condition and results of operations are based upon our consolidated financial statements, which have been prepared in accordance with accounting principles generally

19

accepted in the United States. The preparation of these financial statements requires that we make estimates and judgments that affect the reported amounts of assets, liabilities, revenues and expenses, and the related disclosure of contingent assets and liabilities. We believe that of our significant accounting policies (see Note 2 to our consolidated financial statements), the following ones may involve a higher degree of judgment on our part and greater complexity of reporting.

*Revenue Recognition:* We recognize revenues for our regulated waste services at the time of waste collection. Payments received in advance are deferred and recognized as services are provided. Revenues from regulated returns management services are recorded at the time services are performed. Royalty revenues are calculated based on measurements specified in each contract or license and revenues are recognized at the end of each reporting period when the activity being measured has been completed. Revenues from product sales are recognized at the time the goods are shipped to the ordering customer. Software licensing revenues are recognized on a prorated basis over the term of the license agreement. We do not have any contracts in a loss position. Losses would be recorded when known and estimable for any contracts that should go into a loss position.

*Goodwill and Other Identifiable Intangible Assets:* Goodwill associated with the excess purchase price over the fair value of assets acquired is not amortized. We have determined that our permits have indefinite lives and, accordingly are not amortized. This position is in accordance with Statement of Financial Accounting Standards No. 142, "Goodwill and Other Intangible Assets" ("SFAS No. 142"). See Note 9 Goodwill and Other Intangible Assets for additional information.

Our balance sheet at December 31, 2007 contains goodwill of $1,033.3 million. In accordance with SFAS No. 142, we evaluate on at least an annual basis, using the fair value of reporting units, whether goodwill is impaired. If we were to determine that a significant impairment has occurred, we would be required to incur non-cash write-offs of the impaired portion of goodwill that could have a material adverse effect on our results of operations in the period in which the write-off occurs. We use the market value of our stock compared to book as the current measurement of total fair value of our company. The performance of each of our reporting units is compared to that fair value ratio, and any unforeseen material drop in our stock price may be an indicator of a potential impairment of goodwill. The results of the 2007 impairment test conducted in June 2007 did not show any impairment of goodwill, and no events have occurred since that time that indicate that an impairment situation exists.

Our permits are currently tested for impairment annually at December 31, or more frequently if circumstances indicate that they may be impaired. We use a discounted income approach model as the current measurement of the fair value of the permits. The estimate of income is based upon, among other things, certain assumptions about expected future operating performance and an appropriate discount rate determined by management. Our estimates of discounted income may differ from actual income due to, among other things, inaccuracies in economic estimates. In the second quarter of 2007 we wrote down approximately $0.2 million for a permit in the United Kingdom due to a management decision to move waste processing to an alternate location. The results of the 2007 impairment test did not show any impairment of our remaining permits and no events have occurred since that time that would indicate an impairment situation exists.

Other identifiable intangible assets, such as customer relationships, tradenames and covenants not-to-compete, are currently amortized using the straight-line method over their estimated useful lives. We have determined that our regulated waste customer relationships have between 20-year and 40-year lives based on the specific type of relationship. This determination was based on an independent study performed on our customer relationships. Although the regulated waste management business is highly competitive we have been able to maintain high customer retention through contracts with automatic renewal provisions and excellent customer service.

The valuation of our contractual customer relationships was derived using a discounted income approach valuation model similar to the method used for permit impairment testing mentioned earlier. These assets are

reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may be less than its undiscounted estimated future cash flows. There have been no indicators of impairment of these intangibles (see Note 9 to our consolidated financial statements).

*Income Taxes:* Deferred income tax liabilities and assets are determined based on the differences between the financial statement and income tax basis of assets and liabilities using enacted tax rates in effect for the year in which the differences are expected to reverse. To provide for certain potential tax exposures, we maintain a reserve for specific tax contingencies, the balance of which management believes is adequate.

In September 2006, the Financial Accounting Standards Board ("FASB") issued FASB Interpretation No. 48, "Accounting for Uncertainty in Income Taxes—an interpretation of FASB Statement No. 109" ("FIN 48"). This interpretation clarifies the accounting for uncertainty in income taxes recognized in an enterprise's financial statements in accordance with Statement of Financial Accounting Standards ("SFAS") No. 109, "Accounting for Income Taxes". This Interpretation prescribes a recognition threshold and measurement attribute for the financial statement recognition and measurement of a tax position taken, or expected to be taken, in a tax return. This interpretation also provides guidance on de-recognition, classification, interest and penalties, accounting in interim periods, disclosure and transition. We adopted the provisions of FIN 48 on January 1, 2007. The adoption of FIN 48 did not have a material impact on our consolidated financial statements.

*Accounts Receivable:* Accounts receivable consist primarily of amounts due to us from our normal business activities. Accounts receivable balances are determined to be delinquent when the amount is past due based on the contractual terms with the customer. We maintain an allowance for doubtful accounts to reflect the expected uncollectibility of accounts receivable based on past collection history and specific risks identified among uncollected accounts. Accounts receivable are charged to the allowance for doubtful accounts when we have determined that the receivable will not be collected and/or when the account has been referred to a third party collection agency. No single customer accounts for more than 2% of our revenues.

*Insurance:* Our insurance for worker's compensation, vehicle liability and physical damage, and employee-related health care benefits is obtained using high deductible insurance polices. A third-party administrator is used to process all such claims. We require all workers' compensation, vehicle liability and physical damage claims to be reported within 24 hours. As a result, we accrue our worker's compensation, vehicle and physical damage liability based upon the claim reserves established by the third-party administrator at the end of each reporting period. Our employee health insurance benefit liability is based on our historical claims experience rate. Our earnings would be impacted to the extent that actual claims vary from historical experience. We review our accruals associated with the exposure to these liabilities for adequacy at the end of each reporting period.

*Litigation:* We operate in a highly regulated industry and deal with regulatory inquiries or investigations from time to time that may be instituted for a variety of reasons. We are also involved in a variety of civil litigation from time to time. Settlements from litigation would be recorded when known, probable and estimable.

*Stock Option Plans:* We have issued stock options to employees and directors as an integral part of our compensation programs. On January 1, 2006, we adopted the provisions of SFAS No. 123R, "Share-Based Payment" ("SFAS No. 123R") using the modified prospective method to account for stock compensation costs. SFAS No. 123R requires the measurement and recognition of compensation expense for all stock-based payment awards made to our employees and directors. Under the fair value recognition provisions of SFAS No. 123R, stock-based compensation cost is measured at the grant date based on the value of the award and is recognized as expense over the vesting period. Determining the fair value of stock-based awards at the grant date requires considerable judgment, including estimating expected volatility, expected term and risk-free rate. Our expected volatility is based upon historical experience. The expected term of the stock options is based upon a measure of historical volatility of our stock price. The risk-free interest rate assumption is based upon the U.S. Treasury yield rates of a comparable period. If factors change and we employ different assumptions, stock-based compensation expense may differ significantly from what we have recorded in the past.

21

*New Accounting Pronouncements:* For information about recently issued accounting pronouncements, see Note 2. "Summary of Significant Accounting Policies" in the Notes to the Consolidated Financial Statements.

*Year Ended December 31, 2007 Compared to Year Ended December 31, 2006*

The following summarizes the Company's operations:

| | Years Ended December 31, | | | |
| | 2007 | | 2006 | |
| | $ | % | $ | % |
| | in thousands, except per share data | | | |
| Revenues | $932,767 | 100.0 | $789,637 | 100.0 |
| Cost of revenues | 491,789 | 52.7 | 419,689 | 53.1 |
| Depreciation | 23,057 | 2.5 | 20,081 | 2.5 |
| Total cost of revenues | 514,846 | 55.2 | 439,770 | 55.7 |
| Gross profit | 417,921 | 44.8 | 349,867 | 44.3 |
| Selling, general and administrative expenses | 168,657 | 18.1 | 137,411 | 17.4 |
| Depreciation | 4,423 | 0.5 | 3,989 | 0.5 |
| Amortization | 3,657 | 0.4 | 2,966 | 0.4 |
| Total selling, general and administrative expenses | 176,737 | 18.9 | 144,366 | 18.3 |
| Gain on sale of assets | (2,099) | (0.2) | — | — |
| Impairment of intangible assets | 2,269 | 0.2 | — | — |
| Impairment of fixed assets | 1,261 | 0.1 | 300 | 0.0 |
| Arbitration award and related costs | 13,904 | 1.5 | — | — |
| Acquisition integration expenses | 1,305 | 0.1 | 3,439 | 0.4 |
| Income from operations | 224,544 | 24.1 | 201,762 | 25.6 |
| Write-down of investment | 2,930 | 0.3 | 1,000 | 0.1 |
| Insurance proceeds | (3,300) | (0.4) | (1,025) | (0.1) |
| Net interest expense | 32,375 | 3.5 | 27,061 | 3.4 |
| Income tax expense | 72,862 | 7.8 | 67,304 | 8.5 |
| Net income | $118,378 | 12.7 | $105,270 | 13.3 |
| Earnings per share—Diluted | $    1.32 | | $    1.16 | |

*Revenues:* Our revenues increased $143.1 million, or 18.1%, to $932.8 million in 2007 from $789.6 million in 2006. Domestic revenues increased $105.0 million, or 17.0%, to $721.4 million from $616.4 million in 2006 as internal growth for domestic small account customers increased by approximately $37.1 million, over 10%, driven by an increase of Steri-Safe customers. Revenues from domestic large account customers increased approximately $13.1 million, or over 6% as we increased the total number of accounts. Returns Management Services increased revenues compared to 2006 by over $22.3 million from internal growth due to larger than expected recall volumes. Domestic acquisitions less than one year old added an additional $32.5 million in revenues compared to 2006.

International revenues in 2007 were $211.4 million, compared to $173.2 million in 2006, an increase of $38.1 million or 22.0%. Internal growth, currency rate fluctuations, acquisitions, and the divestiture of some plants in the United Kingdom, impact the comparison of 2007 to 2006. Internal growth was $16.2 million. The effect of exchange rates favorably impacted international 2007 revenues by $11.8 million as foreign currencies appreciated against the U.S. dollar, acquisitions less than one year old favorably impacted revenues by $24.5 million, while the divestiture at a gain of selected Sterile Technologies Group, Ltd., ("STG") plants in the first quarter of 2007 negatively impacted the comparison to 2006 by $14.4 million.

*Cost of Revenues:* Our 2007 cost of revenues increased $75.1 million, or $17.1%, to $514.8 million compared to $439.8 million in 2006. Domestic cost of revenues increased $47.4 million, or 14.7%, to $369.9 million in 2007 compared to $322.6 million for 2006. International cost of revenues increased $27.7 million, or 23.6%, to $144.9 million in 2007 compared to $117.2 million in 2006.

Our gross margin percentage increased to 44.8% during 2007 from 44.3% during 2006. Domestic gross margin percentage improved 1.0% in 48.7% during 2007 from 47.7% in 2006. Our gross margin increase was primarily the result of increased number of small quantity customers, which have a better gross margin. Domestic energy and transportation costs increased in 2007, which were partially offset by higher revenues related to fuel surcharges.

International gross margin decreased 0.9% in 2007 compared to 2006, primarily due to acquisitions whose margins are lower. In general, international gross margins are lower than domestic gross margins because the international operations have less penetration into the small quantity generator market, which has a better gross margin. Historically, the international operations have had most of their revenues from large national healthcare hospitals. As the international segment increases, consolidated gross margins receive downward pressure due this "business mix", which can be offset by additional international small quantity market penetration, integration savings and domestic business expansion.

*Selling, General and Administrative Expenses:* In 2007, our selling, general and administrative ("SG&A") expenses increased $32.4 million, or 22.4%, to $176.7 million from $144.4 million in 2006. Amortization and depreciation expense, as a percentage of revenue, did not change from 2006 to 2007. Domestically, 2007 SG&A increased $26.6 million, or 22.8%, to $143.1 million from $116.6 million in 2006. The increase was primarily due to spending related to market penetration for our Bio Systems® sharps management program and investments in the Steri-Safe and returns management services.

Internationally, our SG&A increased $5.8 million, or 20.7%, in 2007 to $33.6 million from $27.8 million in 2006, mostly due to foreign exchange fluctuations (higher dollar costs as the dollar weakened versus other currencies). As a percentage of revenue, international SG&A decreased 0.2%. This decrease reflects the ongoing efforts to integrate our businesses in the United Kingdom and Argentina.

*Income from Operations:* Income from operations increased by $22.8 million, or 11.3%, to $224.5 million in 2007 from $201.8 million in 2006. Comparisons of income from operations between 2007 and 2006 are affected by various charges not considered part of our day-to-day operations. During the year ended December 31, 2007 we had charges totaling $17.4 million related to permit write-offs, fixed asset write-offs and settlement of arbitration proceedings in Australia. Those charges were partially offset by gains of $2.1 million from the sale of assets of STG and of Scherer Labs. During the year ended December 31, 2006, we recorded expenses of $0.3 million related to fixed asset write downs.

Domestically, our income from operations increased $17.7 million, or 10.1%, to $192.8 million from $175.1 million in 2006. Internationally our income from operations increased $5.1 million, or 19.1%, to $31.7 million from $26.7 million in 2006.

*Interest Expense and Interest Income:* Interest expense increased to $34.0 million during 2007 from $28.4 million during 2006. The increase of $5.6 million is related to higher debt levels incurred to finance acquisitions and stock repurchases. Interest income was $1.6 million during 2007 and $1.4 million during 2006.

*Write-down of Investment:* During 2007 we had a $2.9 million non-cash write-down of our investment in Medam B.A., an Argentine medical waste processing company. The write-down was due to a legal restructuring of the Medam B.A. operations. Stericycle now is the sole owner of Medam B.A. During 2006 we had a $1.0 million non-cash write-down of an investment in securities.

23

*Proceeds from Insurance:* During 2007 we received $3.3 million of insurance proceeds related to the 3CI litigation settled in 2005. During 2006 we received $1.0 million of insurance proceeds related to the 3CI litigation settled in 2005.

*Income Tax Expense:* Income tax expense for the years 2007 and 2006 reflects an effective tax rate of approximately 38.1% and 39.0%, respectively, for federal and state income taxes.

### Year Ended December 31, 2006 Compared to Year Ended December 31, 2005

The following summarizes the Company's operations:

| | Years Ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2006 | | 2005 | |
| | $ | % | $ | % |
| | in thousands, except per share data | | | |
| Revenues | $789,637 | 100.0 | $609,457 | 100.0 |
| Cost of revenues | 419,689 | 53.1 | 324,988 | 53.3 |
| Depreciation | 20,081 | 2.5 | 16,432 | 2.7 |
| Total cost of revenues | 439,770 | 55.7 | 341,420 | 56.0 |
| Gross profit | 349,867 | 44.3 | 268,037 | 44.0 |
| Selling, general and administrative expenses | 137,411 | 17.4 | 93,033 | 15.3 |
| Depreciation | 3,989 | 0.5 | 3,403 | 0.6 |
| Amortization | 2,966 | 0.4 | 1,596 | 0.3 |
| Total selling, general and administrative expenses | 144,366 | 18.3 | 98,032 | 16.1 |
| Licensing legal settlement | — | — | 1,823 | 0.3 |
| Impairment of fixed assets | 300 | 0.0 | 872 | 0.1 |
| Acquisition integration expenses | 3,439 | 0.4 | 778 | 0.1 |
| Income from operations | 201,762 | 25.6 | 166,532 | 27.3 |
| Write-down of security investment | 1,000 | 0.1 | — | — |
| Write-down of note receivable with joint venture | — | — | 2,495 | 0.4 |
| 3CI legal settlement (2005)/ proceeds from insurance (2006) | (1,025) | (0.1) | 36,481 | 6.0 |
| Net interest expense | 27,061 | 3.4 | 12,247 | 2.0 |
| Income tax expense | 67,304 | 8.5 | 44,826 | 7.4 |
| Net income | $105,270 | 13.3 | $ 67,154 | 11.0 |
| Earnings per share—diluted | $  1.16 | | $   0.74 | |

*Revenues:* Our revenues increased $180.2 million, or 29.6%, to $789.6 million in 2006 from $609.5 million in 2005. Domestic revenues increased $108.2 million, or 21.3%, to $616.4 million from $508.3 million in 2005 as internal growth for domestic small account customers increased by approximately $33.5 million, or 11%, and internal growth for large quantity customers increased by approximately $16.5 million, or 9%. Internal growth for returns management was $7.8 million, and acquisitions less than one year old contributed approximately $50.4 million to the increase in domestic revenues.

International revenues increased $72.0 million to $173.2 million from $101.2 million in 2005. Internal growth of international revenues, excluding the $3.2 million effect of favorable exchange rates, was approximately $9.4 million, or 9.3%. International acquisitions less than one year old contributed approximately $59.4 million to the increase in international revenues.

Through our acquisition of The Sterile Technologies Group Limited and Habitat Ecologico S.A. in February 2006, we were able to expand our geographic presence outside of North America.

***Cost of Revenues:*** Our cost of revenues increased $98.4 million, or 28.8%, to $439.8 million during 2006 from $341.4 million during 2005. Our domestic cost of revenues increased $50.1 million, or 18.3%, to $322.6 million from $272.7 million in 2005, and our international cost of revenues increased $48.3 million to $117.2 million from $68.7 million in 2005. This increase was primarily due to an increase in incremental expenses in both domestic and international cost of revenues as a result of acquisitions completed during 2006.

Our gross margin percentage increased to 44.3% during 2006 from 44.0% during 2005. Domestic gross margin increased to 47.7% in 2006 from 46.5% in 2005 and international gross margin increased to 32.2% in 2006 from 31.4% in 2005. The increase in the gross margins of our domestic business was a result of increased efficiencies and higher margin service add-ons, and the increase in the gross margins of our international business was a result of continued acquisition integration efficiencies and of leveraging our international infrastructure. In general, international gross margins are lower than domestic gross margins because the international operations have less penetration into the small quantity generator market, which has a better gross margin. Historically, the international operations have had most of their revenues from large national healthcare hospitals. Margins may be impacted by acquisitions in any period as the revenue may change.

***Selling, General and Administrative Expenses:*** In 2006, our SG&A expenses, less stock compensation expense, increased $36.5 million, or 37.2%, to $134.5 million from $98.0 million in 2006. Effective January 1, 2006 we adopted SFAS No. 123R using the modified prospective basis, which resulted in a change in the way we recognize share-based compensation expense, which increased SG&A expenses by $9.8 million or 1.2% as a percentage of revenue.

Domestically, 2006 SG&A, less stock compensation expense, increased $25.6 million, or 31.6%, to $106.7 million from $81.0 million in 2005. The increase was primarily due to spending related to market penetration for our Bio Systems® sharps management program and increased investing in growing the Steri-Safe products. Internationally, our SG&A increased $10.9 million, or 64.0%, in 2006 to $27.8 million from $17.0 million in 2005. The increase was primarily due to the acquisition of STG in February 2006.

***Income from Operations:*** Income from operations increased $35.2 million or 21.2% to $201.8 million during 2006 from $166.5 million during 2005. The increase was due to higher gross margin partially offset by higher SG&A expenses. During the year ended December 31, 2006, we recorded expenses of $3.4 million related to acquisition integration compared to $0.8 million in 2005. Of the $3.4 million of 2006 expense, approximately $1.1 million related to facility closures; one in the United States and one in the United Kingdom. During the year ended December 31, 2006 we recorded a $0.3 million non-cash write-down of equipment acquired from 3CI. During the year ended December 31, 2005 we recorded a non-cash impairment charge of $0.9 million related to our Springhill, Louisiana building and property. Income from operations as a percentage of revenue decreased to 25.6% during 2006 from 27.3% during 2005 as a result of the factors described above.

***Interest Expense and Interest Income:*** Interest expense increased to $28.4 million during 2006 from $13.0 million during 2005, primarily due to higher debt levels and higher interest rates during the year. Interest income was $1.4 million during 2006 and $0.8 million during 2005.

***Write-down of Investment:*** During 2006 we had a $1.0 million non-cash write-down of an investment in securities.

***Proceeds from Insurance:*** During 2006 we received $1.0 million for insurance proceeds related to the 3CI litigation.

***Legal Settlements:*** During 2005 we incurred $36.5 million in expenses related to the preliminary settlement of the 3CI class action litigation and related legal expenses.

***Write-down of note receivable:*** During 2005 we wrote-down a $2.5 million note receivable that we had recorded from the sale of interest in our former South African joint venture when we had determined that the amount was uncollectible.

25

*Income Tax Expense:* Income tax expense for the years 2006 and 2005 reflects an effective tax rate of approximately 39.0% and 40.0%, respectively, for federal and state income taxes. The legal settlement negatively impacted our 2005 effective tax rate by 1.0%.

### Liquidity and Capital Resources

On August 24, 2007, we amended and restated our $650.0 million senior unsecured revolving credit facility maturing in July 2011. The credit facility was increased to $850.0 million and the maturity was extended to August 24, 2012. At December 31, 2007 the margin for interest rates on borrowings under our new credit facility was 0.0% on base rate (at the higher of (i) the federal funds rate plus 0.5% or (ii) the prime rate) loans and 0.625% on LIBOR loans. Our credit facility requires compliance with various financial, reporting and other covenants and restrictions, including a restriction on dividend payments. At December 31, 2007, we were in compliance with all of our financial debt covenants.

As of December 31, 2007, we had $465.4 million of borrowings outstanding under our senior unsecured credit facility, which includes foreign currency borrowings of $16.0 million. In addition, we had $139.4 million committed to outstanding letters of credit. The weighted average rate of interest on the unsecured revolving credit facility was 5.53% per annum. At December 31, 2007 we had $170.4 million in other debt outstanding, which includes promissory notes issued in connection with acquisitions during 2004 through 2007, other foreign subsidiary bank debt and $1.7 million in capital leases.

*Working Capital:* At December 31, 2007, our working capital was $60.6 million compared to working capital of $76.6 million at December 31, 2006. Working capital decreased by $26.5 million due to the completion of the divestiture of selected STG plants that were classified as "Assets of disposal group held for sale" and "Liabilities of disposal group held for sale" and presented as current assets and current liabilities at December 31, 2006. Working capital increased by $27.0 million due to higher accounts receivable related to increased revenues, and decreased $15.0 million due to higher accounts payable.

*Net Cash Provided or Used:* Net cash provided by operating activities was $174.0 million during 2007 compared to $160.2 million for 2006. The increase was primarily due to increased net income and accounts payable.

Net cash used in investing activities during 2007 was $135.3 million compared to $201.4 million used in 2006. The difference is due to approximately $49.2 million less paid for acquisitions and $26.5 million received from the divestiture of selected STG plants completed in February 2007, partially offset by $12.0 million in increased capital expenditures.

At December 31, 2007 we had approximately 9% of our treatment capacity in North America in incineration and approximately 91% in non-incineration technologies, such as autoclaving and our proprietary patented ETD technology. The implementation of our commitment to move away from incineration in North America may result in a write-down of the incineration equipment as and when we close incinerators that we are currently operating. The net book value of our North American incinerators was approximately $7.3 million, or 0.5% of our total assets. Our commitment to move away from incineration in North America is in the nature of a goal to be accomplished over an undetermined number of years. Because of uncertainties relating, among other things, to customer education and acceptance and legal requirements to incinerate portions of the medical waste, we do not have a timetable for this transition or specific plans to close any of our existing incinerators.

Net cash used in financing activities was $32.6 million during 2007 compared to net cash provided of $52.5 million for 2006. Approximately $60.9 million of this difference is the result of an increase in the repurchase of and cancellation of common stock in 2007 compared to 2006, while another $18.5 million is related to the pay down of long-term debt.

***Contractual Cash Commitments:*** The following table displays our future contractual cash commitments:

| Payments due by period (dollars in thousands) | Total | 2008 | 2009-2010 | 2011-2012 | 2013 and After |
|---|---|---|---|---|---|
| Long-term debt(1) | $782,585 | $53,442 | $106,955 | $549,577 | $ 72,611 |
| Capital lease obligations(1) | 1,875 | 683 | 990 | 202 | — |
| Purchase obligations | 1,057 | 642 | 415 | — | — |
| Operating leases | 138,568 | 31,083 | 50,208 | 28,552 | 28,725 |
| Other long-term liabilities(1)(2) | 2,869 | 799 | 1,349 | 556 | 165 |
| Total contractual cash obligations | $926,954 | $86,649 | $159,917 | $578,887 | $101,501 |

(1) The long-term debt, capital lease and other long-term liabilities items include both the future principal payment amount as well as an amount calculated for expected future interest payments. For long-term debt with variable rates of interest, management used judgment to estimate the future rate of interest. Other long-term liabilities include amounts related to non-compete agreements.

(2) Excludes payments for unrecognized tax benefits. Based on the contingent and uncertain nature of our liability for unrecognized tax benefits, we are unable to make an estimate of the period of potential settlement, if any, with respective taxing authorities.

At December 31, 2007 we had $139.4 million in stand-by letters of credit issued.

We anticipate that our operating cash flow, together with borrowings under our senior secured credit facility, will be sufficient to meet our anticipated future operating expenses, capital expenditures and debt service obligations as they become due during the next 12 months and the foreseeable future.

***Guarantees:*** We have guaranteed a loan to JPMorganChase Bank N.A. on behalf of Shiraishi-Sogyo Co. Ltd ("Shiraishi"). Shiraishi is a customer in Japan that is expanding their medical waste management business and has a six-month loan with a current balance of $4.3 million with JPMorganChase Bank N.A. that expires in May 2008. Management currently believes no amount will be paid under the guarantee.

### Item 7A. Quantitative and Qualitative Disclosures about Market Risk

We are subject to market risks arising from changes in interest rates. Our potential additional interest expense over one year that would result from a hypothetical, instantaneous and unfavorable change of 100 basis points in the interest rate on all of our variable rate obligations would be approximately $4.9 million on a pre-tax basis.

We have exposure to currency exchange rate fluctuations between the U.S. dollar and U.K. pound sterling ("GBP") related to an 11 million GBP inter-company loan to Stericycle International, Ltd., the parent company of White Rose Environmental. We use cash flow hedge accounting treatment on our forward contracts. Both the inter-company loan balance and the forward contracts are marked to market at the end of each reporting period and the impact on the balances is recorded on the balance sheet to other comprehensive income.

We have exposure to commodity pricing for gas and diesel fuel for our trucks and for the purchase of containers and boxes. We do not hedge these items to manage the exposure.

27

**Item 8. Consolidated Financial Statements and Supplemental Data**

**Management's Report on Internal Control Over Financial Reporting**

The management of the Company is responsible for establishing and maintaining adequate internal control over financial reporting. Internal control over financial reporting is defined in Rules 13a-15(f) under the Securities Exchange Act of 1934 as a process designed by, or under the supervision of, a company's principal executive and principal financial officers and effected by the company's board of directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. generally accepted accounting principles. The Company's internal control over financial reporting includes those policies and procedures that:

(i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company;

(ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with U.S. generally accepted accounting principles, and that receipts and expenditures of the Company are being made only in accordance with authorizations of management and directors of the Company; and

(iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

The Company's management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2007. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control–Integrated Framework.

Based on this assessment and those criteria, management concludes that the Company maintained effective internal control over financial reporting as of December 31, 2007.

The Company's independent auditors have issued an attestation report on the Company's internal control over financial reporting. That report appears on page 29.

Stericycle, Inc.

Lake Forest, IL
February 27, 2008

**Report of Independent Registered Public Accounting Firm**
**on Internal Control over Financial Reporting**

**The Board of Directors and Shareholders of Stericycle, Inc.**

We have audited Stericycle, Inc.'s internal control over financial reporting as of December 31, 2007, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (the COSO criteria). Stericycle, Inc.'s management is responsible for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, Stericycle, Inc. maintained, in all material respects, effective internal control over financial reporting as of December 31, 2007, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of Stericycle, Inc. and Subsidiaries as of December 31, 2007 and 2006, and the related consolidated statements of income, changes in shareholders' equity, and cash flows for each of the three years in the period ended December 31, 2007 and our report dated February 27, 2008 expressed an unqualified opinion thereon.

Ernst & Young LLP

Chicago, Illinois
February 27, 2008

**Report of Independent Registered Public Accounting Firm**

**The Board of Directors and Shareholders of Stericycle, Inc.**

We have audited the accompanying consolidated balance sheets of Stericycle, Inc. and Subsidiaries as of December 31, 2007 and 2006, and the related consolidated statements of income, changes in shareholders' equity, and cash flows for each of the three years in the period ended December 31, 2007. Our audits also included the financial statement schedule listed in the Index at Item 15(a). These financial statements and schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements and schedule based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Stericycle, Inc. and Subsidiaries at December 31, 2007 and 2006, and the consolidated results of their operations and their cash flows for each of the three years in the period ended December 31, 2007, in conformity with U.S. generally accepted accounting principles. Also, in our opinion, the related financial statement schedule, when considered in relation to the basic financial statements taken as a whole, presents fairly in all material respects the information set forth herein.

As disclosed in Note 2 to the consolidated financial statements, the Company changed its method of accounting for stock-based compensation in accordance with the guidelines provided in Statement of Financial Accounting Standards No. 123(R) "Share-Based Payment" on January 1, 2006.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), Stericycle, Inc.'s internal control over financial reporting as of December 31, 2007, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated February 27, 2008 expressed an unqualified opinion thereon.

Ernst & Young LLP

Chicago, Illinois
February 27, 2008

STERICYCLE, INC. AND SUBSIDIARIES

CONSOLIDATED BALANCE SHEETS

In thousands, except share and per share data

|  | December 31, | |
|---|---|---|
|  | 2007 | 2006 |
| **ASSETS** | | |
| **Current assets:** | | |
| Cash and cash equivalents | $ 17,108 | $ 13,492 |
| Short-term investments | 1,256 | 2,548 |
| Accounts receivable, less allowance for doubtful accounts of $6,157 in 2007 and $5,411 in 2006 | 157,435 | 130,354 |
| Deferred income taxes | 13,510 | 16,072 |
| Assets of disposal group held for sale | — | 33,674 |
| Other current assets | 20,967 | 22,462 |
| **Total current assets** | 210,276 | 218,602 |
| Property, plant and equipment, net | 193,039 | 156,953 |
| **Other assets:** | | |
| Goodwill | 1,033,333 | 813,973 |
| Intangible assets, less accumulated amortization of $12,230 in 2007 and $11,454 in 2006 | 152,689 | 115,879 |
| Other | 18,822 | 22,499 |
| **Total other assets** | 1,204,844 | 952,351 |
| **Total assets** | $1,608,159 | $1,327,906 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| **Current liabilities:** | | |
| Current portion of long-term debt | $ 22,003 | $ 22,681 |
| Accounts payable | 40,049 | 25,033 |
| Accrued liabilities | 75,571 | 75,434 |
| Deferred revenues | 12,095 | 11,662 |
| Liabilities of disposal group held for sale | — | 7,221 |
| **Total current liabilities** | 149,718 | 142,031 |
| Long-term debt, net of current portion | 613,781 | 443,115 |
| Deferred income taxes | 125,041 | 105,521 |
| Other liabilities | 5,544 | 12,158 |
| **Common shareholders' equity:** | | |
| Common stock (par value $.01 per share, 120,000,000 shares authorized, 87,410,653 issued and outstanding in 2007, 88,503,930 issued and outstanding in 2006) | 874 | 886 |
| Additional paid-in capital | 197,462 | 252,125 |
| Accumulated other comprehensive income | 30,520 | 5,229 |
| Retained earnings | 485,219 | 366,841 |
| **Total shareholders' equity** | 714,075 | 625,081 |
| **Total liabilities and shareholders' equity** | $1,608,159 | $1,327,906 |

The accompanying notes are an integral part of these financial statements.

31

**STERICYCLE, INC. AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF INCOME**
**In thousands, except share and per share data**

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2007 | 2006 | 2005 |
| Revenues | $ 932,767 | $ 789,637 | $ 609,457 |
| Costs and expenses: | | | |
| Cost of revenues | 514,846 | 439,770 | 341,420 |
| Selling, general and administrative expenses | 176,737 | 144,366 | 98,032 |
| Licensing legal settlement | — | — | 1,823 |
| Gain on sale of assets | (2,099) | — | — |
| Impairment of intangible assets | 2,269 | — | — |
| Impairment of fixed assets | 1,261 | 300 | 872 |
| Arbitration award and related costs | 13,904 | — | — |
| Acquisition integration expenses | 1,305 | 3,439 | 778 |
| Total costs and expenses | 708,223 | 587,875 | 442,925 |
| Income from operations | 224,544 | 201,762 | 166,532 |
| | | | |
| Other income (expense): | | | |
| Interest income | 1,590 | 1,358 | 764 |
| Interest expense | (33,965) | (28,419) | (13,011) |
| Write-down of investment | (2,930) | (1,000) | — |
| Debt extinguishment and refinancing | — | — | (447) |
| Write-down of note receivable with former joint venture | — | — | (2,495) |
| 3CI legal settlement (2005)/proceeds from insurance (2006 and 2007) | 3,300 | 1,025 | (36,481) |
| Other expense, net | (1,299) | (2,152) | (2,882) |
| Total other expense | (33,304) | (29,188) | (54,552) |
| Income before income taxes | 191,240 | 172,574 | 111,980 |
| Income tax expense | 72,862 | 67,304 | 44,826 |
| Net Income | $ 118,378 | $ 105,270 | $ 67,154 |
| Earnings per common share: | | | |
| Basic | $ 1.35 | $ 1.19 | $ 0.76 |
| Diluted | $ 1.32 | $ 1.16 | $ 0.74 |
| Weighted average number of common shares outstanding: | | | |
| Basic | 87,578,650 | 88,466,990 | 88,569,160 |
| Diluted | 89,933,242 | 90,529,998 | 90,621,018 |

The accompanying notes are an integral part of these financial statements.

32

STERICYCLE, INC. AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF CASH FLOWS
**In thousands**

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2007 | 2006 | 2005 |
| **OPERATING ACTIVITIES:** | | | |
| Net income ................................................ | $ 118,378 | $ 105,270 | $ 67,154 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Gain on sale of assets ................................................ | (2,099) | — | — |
| Loss on sale and impairment of fixed assets ............................... | 1,261 | 300 | 872 |
| Impairment of intangibles ................................................ | 2,269 | — | 1,431 |
| Write down of investment ................................................ | 2,930 | 1,000 | — |
| Write-off a deferred financing costs ...................................... | — | — | 447 |
| Write-down of note receivable with former joint venture .................... | — | — | 2,495 |
| Stock compensation expense ............................................. | 10,714 | 10,610 | 27 |
| Excess tax benefit of disqualifying dispositions of stock options and exercise of non-qualified stock options ................................................ | (8,054) | (8,427) | 7,432 |
| Depreciation ............................................................ | 27,480 | 24,070 | 19,835 |
| Amortization ........................................................... | 3,657 | 2,966 | 1,596 |
| Deferred income taxes .................................................. | 17,265 | 12,937 | 13,514 |
| Changes in operating assets and liabilities, net of effect of acquisitions and divestitures: | | | |
| Accounts receivable ................................................ | (11,400) | (14,742) | (19,679) |
| Accounts payable ................................................... | 6,987 | (6,003) | 7,393 |
| Accrued liabilities .................................................. | 1,566 | 28,107 | (8,056) |
| Deferred revenues .................................................. | 537 | 280 | 2,737 |
| Other assets ....................................................... | 2,551 | 3,794 | (2,871) |
| Net cash provided by operating activities .................................. | 174,042 | 160,162 | 94,327 |
| **INVESTING ACTIVITIES:** | | | |
| Payments for acquisitions and international investments, net of cash acquired .... | (114,781) | (164,015) | (139,696) |
| Proceeds from maturity/(purchase) of short-term investments ................ | 1,301 | (1,828) | (621) |
| Proceeds from sale of assets ............................................ | 26,616 | — | 10,328 |
| Proceeds from sale of property and equipment ............................ | — | 832 | 302 |
| Capital expenditures .................................................... | (48,397) | (36,414) | (26,314) |
| Net cash used in investing activities ...................................... | (135,261) | (201,425) | (156,001) |
| **FINANCING ACTIVITIES:** | | | |
| Proceeds from issuance of note payable .................................. | — | 5,953 | 735 |
| Repayment of long-term debt ........................................... | (30,447) | (30,735) | (12,845) |
| Borrowings on senior credit facility ..................................... | 506,472 | 362,452 | 399,022 |
| Repayments of senior credit facility ..................................... | (428,786) | (265,988) | (278,706) |
| Principal payments on capital lease obligations ........................... | (212) | (816) | (795) |
| Payments of deferred financing costs .................................... | (606) | (453) | (1,484) |
| Purchase/ cancellation of treasury stock ................................. | (103,679) | (42,757) | (60,657) |
| Proceeds from other issuance of common stock ........................... | 16,569 | 16,464 | 14,230 |
| Excess tax benefit of stock options exercised ............................ | 8,054 | 8,427 | — |
| Net cash (used in)/ provided by financing activities ........................ | (32,635) | 52,547 | 59,500 |
| Effect of exchange rate changes on cash .................................. | (2,530) | (5,617) | 2,149 |
| Net decrease in cash and cash equivalents ................................ | 3,616 | 5,667 | (25) |
| Cash and cash equivalents at beginning of year ............................ | 13,492 | 7,825 | 7,850 |
| Cash and cash equivalents at end of year .................................. | $ 17,108 | $ 13,492 | $ 7,825 |
| **NON-CASH ACTIVITIES:** | | | |
| Net issuance of notes payable for certain acquisitions ..................... | $ 112,509 | $ 30,157 | $ 49,736 |
| Net issuance of common stock for certain acquisitions ..................... | 13,667 | 750 | — |

The accompanying notes are an integral part of these financial statements.

STERICYCLE, INC. AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF CHANGES IN EQUITY
Years Ended December 31, 2007, 2006 and 2005
In thousands

| | Issued and Outstanding Shares | Amount | Additional Paid-In Capital | Retained Earnings | Accumulated Other Comprehensive Income (Loss) | Total Equity |
|---|---|---|---|---|---|---|
| Balance at December 31, 2004 . . . . . . . . . . . . . . . | 89,464 | $896 | $ 297,598 | $194,417 | $ 2,461 | $ 495,372 |
| Issuance of common stock for exercise of options and warrants and employee stock purchases . . . . | 1,336 | 14 | 14,234 | — | — | 14,248 |
| Purchase/Cancellation of treasury stock . . . . . . . . . | (2,500) | (26) | (60,631) | — | — | (60,657) |
| Excess tax benefit of disqualifying dispositions of stock options and exercise of non-qualified stock options . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | 7,432 | — | — | 7,432 |
| Currency translation adjustment . . . . . . . . . . . . . . | — | — | — | — | (1,817) | (1,817) |
| Change in fair value of cashflow hedge . . . . . . . . . | — | — | — | — | (98) | (98) |
| Net income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | — | 67,154 | — | 67,154 |
| Comprehensive income . . . . . . . . . . . . . . . . . . . . . . | | | | | | 65,239 |
| Balance at December 31, 2005 . . . . . . . . . . . . . . . | 88,300 | $884 | $ 258,633 | $261,571 | $    546 | $ 521,634 |
| Issuance of common stock for exercise of options and warrants and employee stock purchases . . . . | 1,540 | 16 | 17,198 | — | — | 17,214 |
| Purchase/ Cancellation of treasury stock . . . . . . . . | (1,336) | (14) | (42,743) | — | — | (42,757) |
| Stock compensation expense . . . . . . . . . . . . . . . . . | — | — | 10.610 | — | — | 10,610 |
| Excess tax benefit of disqualifying dispositions of stock options and exercise of non-qualified stock options . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | 8,427 | — | — | 8,427 |
| Currency translation adjustment . . . . . . . . . . . . . . | — | — | — | — | 4,350 | 4,350 |
| Change in fair value of cashflow hedge . . . . . . . . . | — | — | — | — | 333 | 333 |
| Net income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | — | 105,270 | — | 105,270 |
| Comprehensive income . . . . . . . . . . . . . . . . . . . . . . | | | | | | 109,953 |
| Balance at December 31, 2006 . . . . . . . . . . . . . . . | 88,504 | $886 | $ 252,125 | $366,841 | $ 5,229 | $ 625,081 |
| Issuance of common stock for exercise of options and warrants and employee stock purchases . . . . | **1,067** | **10** | **16,559** | — | — | **16,569** |
| Issuance of common stock for acquisitions . . . . . . | **228** | **2** | **13,665** | — | — | **13,667** |
| Purchase/ Cancellation of treasury stock . . . . . . . . | **(2,388)** | **(24)** | **(103,655)** | — | — | **(103,679)** |
| Stock compensation expense . . . . . . . . . . . . . . . . . | — | — | **10,714** | — | — | **10,714** |
| Excess tax benefit of disqualifying dispositions of stock options and exercise of non-qualified stock options . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | **8,054** | — | — | **8,054** |
| Currency translation adjustment . . . . . . . . . . . . . . | — | — | — | — | **25,125** | **25,125** |
| Change in fair value of cashflow hedge . . . . . . . . . | — | — | — | — | **166** | **166** |
| Net income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | — | **118,378** | — | **118,378** |
| Comprehensive income . . . . . . . . . . . . . . . . . . . . . . | | | | | | 143,669 |
| Balance at December 31, 2007 . . . . . . . . . . . . . . . | **87,411** | **$874** | **$ 197,462** | **$485,219** | **$30,520** | **$ 714,075** |

The accompanying notes are an integral part of these financial statements.

34

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLOMBIA

Gloria Jean Ware,             )

              )     CASE No: 1:08-cv-00233-RBW

      Plaintiff,      )

              )

        v.           )

              )

Nicklin Associates, Inc., *et al.*   )

              )

      Defendants.    )

              )

**PLAINTIFF'S CONTROVERTED
STATEMENT OF MATERIAL FACT**

1.    Plaintiff is without information to admit or deny the asserttions of SMF ¶1.

2.    Plaintiff admits the assertions of SMF ¶2.

3.    Plaintiff admits the assertions of SMF ¶3.

4.    Plaintiff admits the assertions of SMF ¶4.

5.    Plaintiff is without information to admit or deny the assertions of SMF ¶5.

6.    Plaintiff admits the assertions of SMF ¶6.

7.    Plaintiff admits the assertions of SMF ¶7.

8.    Plaintiff is without information to admit or deny the assertions of SMF ¶8.

9.    Plaintiff is without information to admit or deny the assertions of SMF ¶9.

10.    Plaintiff is without information to admit or deny the assertions of SMF ¶10.

11.    Plaintiff is without information to admit or deny the assertions of SMF ¶11.

12.    Plaintiff admits the assertions of SMF ¶12.

EX. D.

Respectfully submitted,

Dated: March 17, 2008

_____/s/_____

C. Michael Tarone, D.C. Bar # 159228
Karl & Tarone
900 17th Street, NW, Suite 1250
Washington, DC 20006
Tel. (202) 293-3200
Fax (202)429-1851)
Counsel for Plaintiff
GLORIA J. WARE

CERTIFICATE OF SERVICE

I, C. Michael Tarone, hereby certify that I served a copy of the foregoing on the parties
identified in the Complaint who have entered appearances in this matter and those who are
named as parties, by first class mail, postage prepaid or electronically, on 3/17/08 as follows:

Martin F. Cardogan, Esquire          (electronically)
c/o Andrew M. Winick, Esquire
5004 Roland Avenue
Baltimore, MD 21210

David N. Hernandez, Esquire          (electronically)
Vedder Price
875 15th Street, NW, Suite 725
Washington, DC 20005

Ms. Gloria J. Ware                   (by mail)
2514 Lorring Drive
Forestville, MD 20747

/s/ C. Michael Tarone
C. Michael Tarone

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other Information before completing this form. | ☐ FEPA  ☒ EEOC | 100-2005-00588 |

| D.C. Office Of Human Rights | and EEOC |
|---|---|

*State or local Agency, if any*

| Name *(Indicate Mr., Ms., Mrs.)* | Home Phone No. *(Incl Area Code)* | Date of Birth |
|---|---|---|
| **Ms. Gloria J. Ware** | **(301) 735-0691** | **11-03-1952** |

Street Address · City, State and ZIP Code
**2514 Lorring Drive Forrestville, MD 20747**

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| **NICKLIN ASSOCIATES, INC.** | **15 - 100** | **(202) 877-0852** |

Street Address · City, State and ZIP Code
**110 Irving Street, N.W., Washington, DC 20010**

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| | | |

Street Address · City, State and ZIP Code

| DISCRIMINATION BASED ON *(Check appropriate box(es).)* | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| ☒ RACE ☐ COLOR ☒ SEX ☐ RELIGION ☐ NATIONAL ORIGIN ☐ RETALIATION ☐ AGE ☐ DISABILITY ☐ OTHER *(Specify below.)* | Earliest **11-24-2003**  Latest **01-23-2005**  ☐ CONTINUING ACTION |

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

I.    I began working for the above-named Respondent in July 2003, as a part-time Secretary. Shortly thereafter I was promoted to Office Manager/Transportation Manager. I performed both of these positions without a pay increase although it was promised. In May 2004 I finally received my pay increase not what was actually discussed, but close to it. The male Transportation Manager received a salary of about $80,000 annually. I currently perform the same functions and make only $46,000 a year in combination with the Office Managers' responsibilities and was told that I am performing these functions in an outstanding manner. I have received verbal harassment from the mechanic George Fox, and David Le Blanc, President. Employees are consistently verbally abused, and threatened with discharge for not wanting to violate DOT regulations. The place where we work is referred to as the Dumb Fuck Factory(DFF) because most of the staff is Black. Some other comments made are "getting a whip to whip the blacks into shape.""Getting chains to hang signs around the necks of the blacks, and referring to them as Mother Fucking Niggers." Most of these comments come from the President, the Vice President and George the mechanic.

II.   Respondent has not given me a reason for denying my pay to reach that of other managers nor have they taken corrective action to stop the comments being made.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| *March 9, 2005* Gloria Jan Ware  Date · Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

Ex. D

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other Information before completing this form. | ☐ FEPA <br> ☒ EEOC | 100-2005-00588 |

| D.C. Office Of Human Rights | and EEOC |
|---|---|
| *State or local Agency, if any* | |

THE PARTICULARS ARE *(Continued from previous page):*

III.  I believe that all blacks have been discriminated against and treated in a hostile manner in violation of Title VII of the Civil Rights Act of 1964, as amended.  Blacks are denied equal terms and conditions when it relates to discharge concerning comments being made about race, but white employees are not treated in the same in manner.  I also believe that because of my gender I have been subjected to unequal pay for duties performed in violation Title VII of the Civil Rights Act of 1964, as amended.

| | |
|---|---|
| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. <br> SIGNATURE OF COMPLAINANT |
| March 9, 2005   Gloria Jean Ware <br> Date          Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE <br> *(month, day, year)* |

# Nicklin Associates Inc.
## 110 Irving Street, NWGC11
## Washington, DC 20010
## Ph (202) 877-0852
## Fx (202) 877-0857

**5/27/2005**

Stanika K Smith, Investigator Support Asst
US EEOC Washington Field Office
1801 L Street, NW / Suite 100
Washington, DC 20507

### RE: EEOC Charge No. 100-2005-00588
### Employer Position Statement

I John Nicklin, Vice President of Nicklin Associates Inc. do hereby deny all allegations
of discrimination filed by Ms. Gloria Ware in your Charge No. 100-2005-00588 on
3/9/2005 and as amended on 4/18/2005.

To specifically address each of the charges contained therein I respond as follows:

### March 9, 2005 CHARGE OF DISCRIMINATION

I.      (a) "I began working for the above-named Respondent in July 2003, as a part-
time secretary. Shortly thereafter I was promoted to Office
Manager/Transportation Manager." **Ms. Ware was first hired as a part time
administrative assistant on July 8, 2003 at a rate of $10/hr. Between the
date of hire and February 2004 Ms. Wares responsibilities and hours had
been increased and soon thereafter it was mutually agreed by Employer
and by Ms. Ware that Ms. Ware would become a salaried office manager.
There was no Transportation Manager position initially and all calls for
service were to be handled by the Office Manager.**

(b) "I performed both of these positions without a pay increase although it was
promised. In May 2004 I finally received my pay increase not what was
actually discussed, but close to it." **Again, there was no "both" because
initially there was no Transportation Manager position and all calls for
service were to be handled by the Office Manager. Ms. Ware had asked
for 35K annual salary to assume the office manager position and agreed
to about February 2004 but since the Employer had been preoccupied
with Union contract negotiations Ms. Ware was asked to hold off under
the promise that she would be duly compensated at a later date, a request
to which she agreed. Then in April 2004 it was mutually agreed that in**

5/27/05

lieu of retroactive pay for the difference between the $10/hr. she had received and a 35K annual salary from February 2004 to April 2004, Ms. Ware would accept a 40K annual salary going forward. On April 12, 2004 Ms. Ware became a salaried management employee compensated at a rate of $41,600 annual pay, which was $1,600 MORE than she had previously agreed to.

(c) "The male Transportation Manager received a salary of about $80,000 annually. I currently perform the same functions and make only $46,000 a year in combination with the Office Managers' responsibilities and was told that I am performing these functions in an outstanding manner." The Transportation Manager was a stop-gap position developed specifically to address Labor/Management issues with Union drivers during Union contract negotiations and whose primary job function was driving trucks. At least two drivers were hired for the Transportation Manager position at salaries commensurate with their experience. Race, color, sex, religion and national origin were not considerations in the hiring process. Ms. Ware was not qualified for this position, did not perform the same labor functions as this stop-gap Transportation Manager and could receive no performance evaluation thereupon. In September 2004 after reaching a contract agreement with the Union, the Employer adopted a non-management lead driver position to perform all of the labor (field) duties of the Transportation Manager thus leaving only the actual handling of calls for service once again up to Ms. Ware. On November 22, 2004 with her full agreement Ms. Ware received a check in the amount of $576.90 after taxes for duties performed retroactive as of October 2004 and a raise to 46K per year annual salary making her the HIGHEST PAID MANAGER ON STAFF.

NOTE: Ms. Ware acknowledged that she used to handle all calls for service and she had frequently lobbied the Employer to get this responsibility back even while the Transportation Manager position was in place. The pay raise negotiated by and between Ms. Ware and the Employer was to compensate Ms. Ware for late night phone calls that would have had to be made from her home to night shift drivers, and she was additionally provided with a company cell phone.

(d) "I have received verbal harassment from the mechanic George Fox, and David LeBlanc, President." Ms. Ware frequently used foul language and made untoward comments about persons within our organization. This practice could only be described as verbal abuse or harassment if taken completely out of context because Ms. Ware herself promoted this type of colorful exchange between management staff and as such has no legitimate claim to being victimized.

(e) "Employees are consistently verbally abused, and threatened with discharge for not wanting to violate DOT regulations." **No employees were ever abused or threatened with discharge for not wanting to violate DOT regulations or for any other reason. More specifically with regard to DOT regulations one of the main reasons the stop-gap Transportation Manager position was created in the first place was to have a management representative in the field driving and making sure DOT regulations were in fact being followed by our employees to the letter of the law. During Union contract negotiations our fear was that labor would refuse to comply with DOT regulations and would attempt to blackmail the company at the bargaining table so we took additional steps to ensure full compliance with all DOT regulations.**

(f) "The place where we work is referred to as the Dumb Fuck Factory (DFF) because most of the staff is Black. Some other comments made are "getting a whip to whip the blacks into shape.""Getting chains to hang signs around the necks of the blacks, and referring to them as Mother Fucking Niggers." Most of these comments come from the President, Vice President and George the mechanic." **These allegations of morally offensive racial slurs are entirely untrue although Ms. Ware does refer under false pretense to one phrase that had been used by management in the past, the DFF. The DFF (Dumb Fucker Factor), not "factory," was an acronym used in private conversation by the President to address revenue lost as a result of completely avoidable (Dumb) errors on the part of any employee. Some examples of the DFF would refer to such occasions as destroying a new $10,000 engine by putting gasoline in a diesel truck even though there was a big sign on the fuel tank "Diesel Only", or going through $5000 worth of tires by hitting the same curb in the same parking lot with the same truck numerous times over a three month period. There was absolutely no correlation to race implied or inferred in management's language or approach to company operations. At the end of the day we have both white employees and black employees who have made dumb mistakes, that is what this thread was about, nothing more.**

**NOTE: Ms. Ware, a black female, was charged among other things with administration of weekly payroll and work schedules and chose to interact with our predominantly black male labor force in street dialog. It was therefore common for Ms. Ware herself to use the word "nigger" or "motherfucker" in the office and in fact one of her hallmark remarks was "we need new niggers." I reiterate, never at any time did the Employer or officers thereof engage in, participate in or promote this type of language.**

II.     "Respondent has not given me a reason for denying my pay to reach that of
other managers nor have they taken corrective action to stop the comments
being made." **Ms. Ware was the highest paid manager on staff. Employer
had one Office Manager (Ms. Ware) making $46K annual salary and six
Account Managers each making $40K annual salary including two
Account Managers in our Baltimore market extension. Employer has not
made the comments alleged by Ms. Ware.**

III.    (a) "I believe that all blacks have been discriminated against and treated in a
hostile manner in violation of Title VII of the Civil Rights Act of 1964, as
amended. **Employer does not discriminate against anyone. Job applicants
are given equal opportunity for employment regardless of their race,
color, sex, religion and national origin; in fact the majority of our
employees are black. Our employees are represented by Teamsters Local
730 out of Washington DC. Please contact our Teamster Business Agent
Mr. Ritchie Brooks at 202-529-3434. Having gone through recent
contract negotiations I can say with certainty that all of our employees
concerns have been heard and addressed to their satisfaction.**

(b) Blacks are denied equal terms and conditions when it relates to discharge
concerning comments being made about race, but white employees are not
treated in the same manner." **No employee was ever discharged for making
comments about race although it did factor into several disciplinary
situations. No black person has ever been discharged specifically for
making racial comments (the man, whitey, cracker, etc) towards white
Employer but Employer did provide notice of termination to a white
employee for making a racial comment about one black employee to
another black employee. The fact of the matter is that the white employee
was off duty at the time of the comment, was highly agitated and had
been drinking. Said employee and has since attempted to make amends to
the aggrieved party but the only reason that employee has not yet been
replaced is because this person is in a key position (plant mechanic) for
which Employer has run numerous job placement adds and interviewed
many applicants. Without exception the applicants that were qualified to
replace the (white) employee were either not willing to commute to DC
every day, not willing to accept the salary available or had failed to show
up after they were hired. Employer has deemed the matter closed upon
extensive counseling the white employee.**

(c) I also believe that because of my gender I have been subjected to unequal
pay for duties performed in violation of Title VII of the Civil Rights Act of
1964, as amended." **Again there is no basis for any claim of discrimination.**

**Ms. Ware, a black female was the highest paid manager in the
management job category.**

## April 18, 2005 AMENDMENT

I.       (a) "On April 13, 2005, I filed an EEOC Charge of Discrimination against the
above named Respondent" **Employer was not aware of an EEOC Charge
of Discrimination made on April 13, 2005 and furthermore the
documentation provided in this claim does not support Ms. Ware's
position.**

(b) "On April 18, 2005 I arrived to work and encountered Director of
Operations Curtis Patton sitting at my desk." **There is only one desk in our
DC office and our Director of Operations and Ms. Ware shared it.**

(c) "I immediately went to Washington Hospital Center's protective Services
to file a complaint because I felt threatened due to a verbal altercation, via the
telephone, between Mr. Patton and myself. Wherein, Mr. Patton demanded
that I submit medical documentation for leaving work early Thursday and
taking off Friday." **Ms. Ware had stated in writing that she was taking
Monday off therefore had no right to be in the office on Monday April 18,
2005 in the first place other than to file a premeditated complaint with
the Washington Hospital Center in violation of confidentiality laws
(reserved). Mr. Patton did not have an "altercation" with Ms. Ware; he
(Mr. Patton) was simply fulfilling his obligation to Employer to contact
Ms. Ware to discuss the terms of her leave to which Ms. Ware answered,
"you don't know who your messin with." Ms. Ware, a salaried Office
Manager had an obligation to Employer for certain duties. Ms. Ware had
left a note on the office chair Thursday stating that she was leaving early
that day, she had a doctors appointment and would be off work Friday
and Monday. Ms. Ware did not request a leave of absence and Ms. Ware
did not notify Employer that she was leaving for the day. In light of the
fact that payroll and billing had not been prepared daily that week as Ms.
Ware had been instructed many times in the past meant that essentially
Employer had no means to meet it's deadlines within budget. As such Mr.
Patton simply stated to Ms. Ware that she would be expected to produce
proof of a valid reason that would preclude her from working on Friday
and Monday, which should be expected under the circumstances.**

(d) "When I returned to my desk a meeting was held between Mr. Patton,
Shop Steward Ceasar Johnson and myself. During this meeting, I was
subjected to unwarranted disciplinary actions and terminated." **The**

"meeting" was that Ms. Ware basically made a huge deal of the fact that she was there with a security report and witness Ceasar "Sonny" Johnson when Mr. Patton simply stated that he needed to talk to her. I have to believe that it would be expected that when a manager takes a ½ day off with no notice followed immediately by taking a long weekend off with no notice and work due both Friday and Monday not yet even started that Employer would see that as a problem. During that meeting Ms. Ware was very insubordinate about the whole thing, she was indignant, she refused to answer basic questions pertaining to company policy and so she was terminated for violation of company policy willfully, insubordination willfully and neglect of duty willfully.

II.     "Respondent stated that I was involuntary terminated due to violation of company policy, insubordination and neglect of duty. I dispute all of these allegations." Ms. Ware was terminated for these reasons. Ms. Ware, the Office Manager of all people is fully aware of company policy such as leave of absence forms and request for days off. The way in which Ms. Ware approached what she knew would be Employers objections to her behavior is indicative of her desire to become unemployed such that she may avail herself of your process for personal gain.

III.    "I believe that I was subjected to retaliation for having previously filing an EEOC complaint in violation of Title VII of the Civil Rights Act of 1964, as amended." This is not possible because Employer was not aware of a previous EEOC complaint.

I declare under penalty of perjury that the above is true and correct:

John Nicklin
Vice President
May 27, 2005

Gloria J. Ware v. Nicklin Associates, Inc.
Charge #: 100-2005-00588

AMENDMENT


Additionally, the following parties engaged in unlawful retaliation against me and subjected me to a hostile work environment when they caused, aided and abetted, ratified and acquiesced in unlawful gender and racial discrimination and unlawful retaliation for my involvement in protected activity:
(a) managerial employees of Nicklin Associates such as David LeBlanc, President, Curtis Patton, Director of Operations, John Nicklin, Vice President, and George Fox; and
(b) employees associated with Steri-cycle Systems which is located at 28161 N. Keith Drive, Lake Forest, Illinois 60005.


I declare of penalty of perjury that the foregoing is true and correct.


_8-4-06_____                        _Gloria J. Ware_____
Date                                                         Charging Party Signature

8/4/06

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act. See enclosed Privacy Act
Statement and other information before completing this form.

Charge Presented To:  Agency(ies) Charge No(s):

☐ FEPA

☒ EEOC

_____ and EEOC

_____
State or local Agency, if any

| Name *(Indicate Mr. Ms., Mrs.)* | Date of Birth |
|---|---|
| Ms Gloria Jean Ware | 11-3-1952 |

Street Address: 2514 Lorring Drive    City, State and ZIP Code: Forestville MD 20747

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two are named, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. with Area Code |
|---|---|---|
| Nicklin Associates Inc (See Note 1) | 25 | See Note 1 |

Street Address: _____    City, State and ZIP Code: _____

| Name | No. Employees, Members | Phone No. with Area Code |
|---|---|---|
| Washington Hospital Center | 5627 | 202-877-7000 |

Street Address: 110 Irving St NW    City, State and ZIP Code: Wash DC 20010

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

☒ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN

☒ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ OTHER *(Specify below.)*

DATE(S) DISCRIMINATION TOOK PLACE
Earliest: Dec 2003    Latest: April 18, 2005

☐ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

I attach and incorporate by reference Notes 1 and 2 into this Supplemental Charge of Discrimination. Note 1 identifies additional responsible parties and provides additional information. Note 2 provides the particulars.

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

NOTARY – When necessary for State and Local Agency Requirements

I declare under penalty of perjury that the above is true and correct.

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

SIGNATURE OF COMPLAINANT
Gloria Jean Ware

7/7/06
Date

Gloria Jean Ware
Charging Party Signature

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
*(month, day, year)*
July 7, 2006

My Commission Expires

## NOTES 1 & 2 FOR ATTACHMENT TO
## AMENDED CHARGE OF DISCRIMINATION

**Charging Party**          **Gloria Ware**

EEOC Case No.               **EEOC Case 100-2005-00588**

Date                        **July 7, 2006**

**Re**          .          **Amendment to Charge of Discrimination**

Note 1

Supplemental information regarding the parties who are responsible is as follows:

The employer involved in this case is Nicklin Associates, Inc, which was bought out by Stericylce, Inc. The company Nicklin Associates, Inc. does not have an address nor a corporate headquarter. Its previous headquarters were in Goshen, NY, 1-800-848-2408. The contact information for John Nicklin is:

> John Nicklin, VP, Marketing
> WasteWatcher.org
> Direct line: 202-262-9892

> Located at Washington Hospital Center
> 110 Irving Street, N.W.
> Washington, DC 20010

> P: 202-877-0852
> F: 202-877-0857

> John.Nicklin@WasteWatcher.org
> Scott.Miller@WasteWatcher.org

> Steri-cycle Systems, 28161 N. Keith Drive, Lake Forest, Illinois 60005

We identify the following respondents that are responsible for the deprivations:
> John Nicklin, VP, Marketing
> Scott Miller
> Nicklin Assocites
> Waste Watcher
> Stericycle Systems, Inc.
> Washington Hospital Center

Page 1 of 2

EX. I          MAR 6

7/7/06.

Note 2

Supplemental information regarding the particulars is as follows:

a.       Ms. Ware asserts that all responsible parties, including all respondents identified herein and in previous filings, engaged in unlawful retaliation against her when     they caused, aided and abetted, ratified and acquiesced in unlawful retaliation as a         reprisal for having engaged in protected activity, and gender and racial         discrimination, and hostile workplace.

b.       The unlawful retaliation was in violation of her rights under the DC Human Rights Act and Title VII.

c.       The unlawful discrimination on the basis of gender and race that is being alleged was in violation of her rights under the DC Human Rights Act and Title VII..

d.       The hostile workplace created by the responsible parties, including all respondents identified herein and in previous filings, violated Ms. Ware's rights under Title VII and the DC Human Rights Act.

e.       The charge of discrimination, we understand, has been cross-filed with the DC Office of Human Rights. Ms. Ware is proceeding under both federal and District of Columbia law. Under the DC Human Rights Act, she can maintain a cause of action against individuals and those who aid and abet the violations. For that reason, she asserts claims against parties in addition to Nicklin Associates. This is letter is also to confirm that today, the Office of Human Rights, through Louisa, declined to allow Ms. Ware to file a separate complaint under the DCHRA.

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the above is true and correct.

7/7/06
Date

_Gloria Jean Ware_
Charging Party Signature

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

_Gloria Jean Ware_
Signature of Complaint

Subscribed and Sworn to Before Me This Date (Month, Day, Year) July 7, 2006

Page 2 of 2

My Commission Expires
July 14, 2007

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act. See enclosed Privacy Act Statement and other information before completing this form | ☐ FEPA<br>☑ EEOC | |

_____ and EEOC

*State or local Agency, if any*

THE PARTICULARS ARE *(Continued from previous page):*

Please see Note 1 and 2

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State or Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT<br>*Gloria Jean Ware* |
| 2/7/06          *Gloria Jean Ware*<br>Date          Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>*(month, day, year )*<br>July 7, 2007<br>My Commission Expires<br>July 14, 2007 |



**U.S. Equal Employment Opportunity Commission**
**D.C. Office Of Human Rights**

1801 L Street, N.W.
Suite 100
Washington, DC 20507
(202) 419-0700
TTY (202) 419-0702
FAX (202) 419-0739

**SEP 2 2 2006**

Gloria J. Ware
c/o C. Michael Tarone, esq.
Karl & Tarone
900 17th Street, NW, Suite 1250
Washington, DC 20006

Re:   Gloria J. Ware vs. NICKLIN ASSOCIATES, INC.
      EEOC No: 100-2005-00588

Dear Ms. Ware:

This is to advise you that the above referenced charge has been transferred to the D.C. Office of Human Rights for processing. This transfer is being done as part of a workload redistribution and should result in a more expeditious resolution of this charge. All future communications regarding this charge should be directed to the D.C. Office of Human Rights.

If you have any information to submit, please forward this information, in writing, to the following address:

D.C. Office of Human Rights
One Judiciary Square, Suite 570N
441 4th Street, NW
Washington, D.C. 20001

Once the charge is assigned to an in investigator from that office, you will be contacted, as appropriate, by that investigator.

Please update your records to reflect this change. Thank you for your cooperation.

Sincerely,

Dana R. Hutter
Director, WFO

cc:

John Nicklin, Vice President
Nicklin Associates Inc.
110 Irving Street, NW   GC11
Washington, DC 20010

EX. J



**U.S. Equal Employment Opportunity Commission**
**D.C. Office Of Human Rights**

1801 L Street, N.W.
Suite 100
Washington, DC 20507
(202) 419-0700
TTY (202) 419-0702
FAX (202) 419-0739

**SEP 2 2 2006**

Gloria J. Ware
c/o C. Michael Tarone, esq.
Karl & Tarone
900 17th Street, NW, Suite 1250
Washington, DC 20006

Re:    Gloria J. Ware vs. NICKLIN ASSOCIATES, INC.
       EEOC No: 100-2005-00588

Dear Ms. Ware:

This is to advise you that the above referenced charge has been transferred to the D.C. Office of Human Rights for processing. This transfer is being done as part of a workload redistribution and should result in a more expeditious resolution of this charge. All future communications regarding this charge should be directed to the  D.C. Office of Human Rights.

If you have any information to submit, please forward this information, in writing, to the following address:

    D.C. Office of Human Rights
    One Judiciary Square, Suite 570N
    441 4th Street, NW
    Washington, D.C.  20001

Once the charge is assigned to an in investigator from that office, you will be contacted, as appropriate, by that investigator.

Please update your records to reflect this change. Thank you for your cooperation.

Sincerely,

Dana R. Hutter
Director, WFO

cc:

John Nicklin, Vice President
Nicklin Associates Inc.
110 Irving Street, NW   GC11
Washington, DC 20010

9/22/06

EEOC Form 161 (3/98)

S. EQUAL EMPLOYMENT OPPORTUNITY COMM    N

## DISMISSAL AND NOTICE OF RIGHTS

To: Ms. Gloria J. Ware
2514 Lorring Drive
Forestville, MD 20747

From: Pittsburgh Area Office
1001 Liberty Avenue
Suite 300
Pittsburgh, PA 15222

[ ] On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR § 1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 100-2005-00588 | Philadelphia Legal Unit | (215) 440-2828 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[ ] The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ] Your allegations did not involve a disability as defined by the Americans with Disabilities Act.

[ ] The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ] Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge.

[ ] Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

[ ] While reasonable efforts were made to locate you, we were not able to do so.

[ ] You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged.

[X] The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ] The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ] Other (briefly state)

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this Notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

_Joseph M Hardiman III_

Joseph M. Hardiman, III  Area Director

Endosure(s)

cc:  Nicklin Associates, Inc.

post Mark
8/24/07

ORIGINAL
Pleadings File
Date:

Pleadings File
Date: 8/28/07

EX  12

Enclosure with EEOC
Form 161 (3/98)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.
If you also plan to sue claiming violations of State law, please be aware that time limits and other
provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS** – **Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days of the date you receive this Notice**. Therefore, you should **keep a record of this date**. Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *mailed* to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

### PRIVATE SUIT RIGHTS -- Equal Pay Act (EPA):

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years) before you file suit** may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/00 to 12/1/00, you should file suit before 7/1/02 – *not* 12/1/02 – in order to recover unpaid wages due for July 2000. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice and within the 2- or 3-year EPA back pay recovery period.

### ATTORNEY REPRESENTATION -- Title VII and the ADA:

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do not relieve you of the requirement to bring suit within 90 days.

### ATTORNEY REFERRAL AND EEOC ASSISTANCE -- All Statutes:

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request within 6 months of this Notice**. (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*